CHRIST O. HAUGEN, Appellee, v. HUMBOLDT-KOSSUTH JOINT DRAINAGE DISTRICT No. 2 et al., Appellants; and thirty-nine other cases.

No. 45312.

DECEMBER 9, 1941.

REHEARING DENIED MARCH 13, 1942.

290

D. M. Kelleher and E. H. Parsons, for appellees.

C. W. Garfield and Shumway & Kelly, for appellants.

Miller, Huebner & Miller, amici curiae.

BLISS, J.—A number of questions have been submitted to us for answer, and the respective contentions of the parties have been ably presented and discussed. Part of the work, consisting of cleaning out the siltage and obstructions in, and deepening and widening, the main ditch and two laterals emptying into it, was done under a written contract at so much a cubic yard, with a provision for per-hour compensation in the event that sand was found in large quantities. There were subsequent verbal agreements respecting the removal of sand which came into the ditches after they had been dredged, and respecting the leasing of the contractor's dredge, by the drainage district, to reclean the dirt and debris which had been washed into the main ditch by a heavy rain, at about the time of the completion of the work under the written contract.

The remainder of the work was largely done under an arrangement with those in charge of a CCC camp at Bancroft, Iowa, and the Bureau of Agricultural Engineering, an agency of the Federal Government, under which the labor and superintendence of the work were furnished by them, at no expense to the drainage district, and the materials for the work and its delivery were furnished by the drainage district and at its expense. This work, just referred to, was largely piecemeal and disconnected, and was done without contract, other than the CCC arrangement, except various separate, and largely verbal contracts for the purchase of material for construction work, and gasoline, oil, etc., used in the operation of the machinery. This latter work, insofar as it involved the issuance of warrants, con-

sisted in greater part of the rebuilding of concrete bulkheads, installing inlets, catchbasins, metal pipe outlets to care for surface and flood waters, the cleaning out, repair of and relaying of tile outlets, and some new tile lines. The drainage district employed an engineer to do the customary engineering work, and to have the general superintendence and management of all of the work done. Except as to the excavation of the open drains, and we will refer later to the letting of this work, there was nothing in the nature of competitive bidding with respect to the purchase of material used in the work.

From the inception of the proposed improvement and throughout the work, the joint boards proceeded upon the theory that all of the work done was authorized by section 7556 of the Code of 1935, and that the statutory proceedings required in the establishment of an original joint drainage district, the letting of contracts, construction of the improvement, classification and assessment of the land in the district, had no application to the work which they were doing. Consequently, they required no petition for the work, no submission of any plan of the work, specifications, estimate of costs, etc., by an engineer. There was no advertising for bids for the letting of any contracts. No statutory commission was appointed to assess benefits. Other provisions of the drainage statutes were disregarded. They insist in this court that their procedure was proper.

The appellees, in their objections filed with the joint boards, and in their appeal to the district court, maintained, and on this appeal maintain, that the work done comes within the provisions of sections 7554 and 7555 of the 1935 Code, and that the same proceedings shall obtain as are provided for the original establishment of drainage districts. They further insist that in the event the Code sections, just referred to, do not apply, and the work done comes within the provisions of section 7556, nevertheless, since the expense incurred is in excess of 10 per cent of the cost of the original improvement and the later extension of the main ditch, "and the nature and/or amount of work * * * differs from mere repairs as defined in section 7561," the joint boards, as required by section 7559, should have ordered a new apportionment of, and assessment upon the lands in the district, under the same rules and proceedings as

provided by statute for an original establishment and assessment. The appellees, therefore, urgently contend that if the work was done under either section 7554, or under section 7556, the appellants failed to follow the statutory requirements, and the assessments made and levied are of no validity or force. The solution of the problem is not easy. With respect to the appellees' contention that the work constituted original or new construction and not repairs, the trial court made no express finding, and stated that it deemed no such finding a necessity, in view of its holding, in effect, that there had been no compliance with the provisions of section 7559. The trial court therefore rendered judgment and decree as to each plaintiff that the resolution of the joint boards of August 6, 1938, making the apportionment, assessment and levy against his land, was cancelled, annulled and set aside as void.

Matters of fact enter largely into the determination of the questions involved. The record is long and we will attempt to summarize the facts as concisely as an understandable presentation of the issues will permit.

Joint Drainage District No. 2 of the counties of Humboldt and Kossuth, containing 19,270 acres, was established January 3, 1907. The main drain, which was an open ditch, except for 1,000 feet of 16-inch tile at the upper end, was dug in 1908. The upper end of said line of tile begins on the north side of an east and west highway between Sections 8 and 17, in Garfield Township, the very southwest corner township of Kossuth County. The open main ditch, and what is called an "extension" of it, continues, from the lower end of said line of tile, south across Sections 17 and 20, and southeasterly across Sections 28, 29, 27, 34 and 35 in said township, and then across the north boundary line of Humboldt County into Section 2, Township 93, Range 29 in said county, and continues southeasterly across Sections 2 and 1 in said township, and Sections 7, 8, 9, 16, 15 and 23 in the township just east, and has its outlet in the latter section in a natural channel which leads to the west fork of the Des Moines river. The main ditch, including the string of 16-inch tile at the upper end, and the "extension," are 13.9 miles in length. In the construction of the main in 1908, station O (zero) was located at the upper end of the

16-inch tile, and stations were located and numbered consecutively downstream every 100 feet to station 573, which was the original outlet of the improvement. In the original construction, the open ditch work, consisting of the main, and open work in laterals "C" and "E," was let as one section. The preliminary engineer in his report gives the following specifications of this open work:

| Line | Length | Grade | Station | Cu. Yds. | Description |
|------|--------|-------|---------|----------|-------------|
| Main | 11000' | .06 | 10 to 120 | 33748 | 4' base, 1:1 slope, 6' berm. |
| Main | 4000' | .06 | 120 to 160 | 12050 | 8' base, 1:1 slope, 6' berm. |
| Main | 6000' | .07 | 160 to 220 | 29233 | 6' base, 1:1 slope, 6' berm. |
| Main | 5500' | .06 | 220 to 275 | 19349 | 8' base, 1:1 slope, 6' berm. |
| Main | 12500' | .06 | 275 to 400 | 48675 | 10' base, 1:1 slope, 6' berm. |
| Main | 17300' | .02 | 400 to 573 | 58123 | 12' base, 1:1 slope, 6' berm. |
| Lat. "C" | 6900' | .16 | 0 to 69 | 17997 | 4' base, 1:1 slope, 6' berm. |
| Lat. "E" | 1500' | .10 | 0 to 15 | 4241 | 4' base, 1:1 slope, 6' berm. |

Total Yardage,    223416

A grade of .06, as testified by one engineer, is a fall of 6 feet in a distance of 10,000 feet, and likewise a grade of .07 is a fall of 7 feet in the same distance.

It was discovered at or before the completion of the original improvement that the grade was too flat at the lower end for an adequate outlet. According to the original profile, the ditch at station 573 had only a 3.2-foot excavation, if it was dug according to the profile. Construction engineer, Goodrich, filed a report June 28, 1909, recommending that the grade from station 400 to station 573, a distance of approximately three miles, be changed from a grade of .02 to a grade of .05, with the same base and side slope, which would require an increased excavation of 37,984.7 cubic yards, and that the original main ditch be extended from station 573 to station 723 plus 78, a distance of about three miles, and making an additional excavation of 72,237 cubic yards. The report was approved and the contract was let September 10, 1909, at 7.9 cents a cubic yard. The total assessment for the extension, of $12,508.40, which undoubtedly included damages for right of way, etc., and general,

overhead expense, was all levied against land in Humboldt County, excepting the sum of $205.65, which was assessed upon Kossuth County land. The cost of the estimated yardage at the contract price would be $8,747.04.

Recognizing that surface waters, unless properly cared for, would greatly impair the usefulness of the system, engineer Goodrich, on August 2, 1912, reported that no provision had been made for the entrance of floodwater into the ditch, which would lead to serious damage in siltage, washing and caving of the banks. He recommended the installation of 132 floodwater inlets, with 7 combination bulkheads and spillways and 40 catchbasins at an estimated cost of $8,520. No favorable action was taken on this report.

The original open excavation was estimated to be considerably in excess of 300,000 cubic yards. There is evidence that the original cost of the improvement, including the extension, as shown by the assessments in both counties, was around eighty or eighty-five thousand dollars, of which approximately $45,000 was for tile lines, railroad crossings and concrete bulkheads. The parties are not in agreement as to the original cost of the open drains and the extension. Including right-of-way damages and overhead expense, the appellants put the cost at approximately $35,000. The appellees, by including overhead expenses and excluding right-of-way damages, and not including the open laterals, place the cost at $14,163.69. Our own judgment, based upon the record, places the original cost of the open work alone, exclusive of either damages or overhead, at approximately $23,500.

There is ample proof in the record that a large part of the open drains had been allowed to get very much out of repair. These drains had been constructed by a dredge which placed the excavated material in waste or spoil banks on each side of the ditch. These banks were not leveled and large trees grew on them and underbrush and rank vegetation extended into the ditches. The banks of the ditches had caved in carrying with them the berm on each side, and parts of the spoil banks. The forces of nature had deposited large quantities of silt in the open drains and in many of the tile drains. There were

many of the closed county laterals and private tile lines whose outlets were partly filled, wholly filled, and some fully submerged with siltage. This siltage ranged in depth from a few inches in the lower part of the main to six or seven feet in the upper miles of it. The caving in of the banks had greatly widened the open drains at the top and in many places had doubled and trebled the bottom width. One of the earliest complaints about the obstruction of the main ditch was filed August 16, 1923. An engineer appointed by the Kossuth board to make a survey, submitted a report in the same month to the joint boards. He reported that the outlet of the 16-inch tile which emptied through the bulkhead at the head of the open ditch was submerged about a foot, the outlet of a 12-inch tile was completely submerged, and that of a 30-inch tile was partly submerged. He reported that the ditch had been constructed on a very slow grade for twelve or thirteen miles, and that he did not believe a first-class outlet could be obtained for the upper end without cleaning all of the open ditch. He thought a temporary outlet could be obtained by beginning a foot below the outlet of the 16-inch tile and cleaning the open ditch for 2,000 feet on a flat grade. The silt in the 16-inch tile filled it at the outlet and was $7\frac{1}{2}$ inches deep at the upper end. The tile was cleaned and the silt was removed for 2,000 feet in the open ditch, at a total cost of $1,040. That was about the extent of any clean-out repairs until 1936. For several years preceding the latter year, many requests had come to the board to clean out the open drains.

There was a Federal CCC camp at Bancroft in Kossuth County, with from 120 to 200 enrollees. Its superintendent, Earl A. Iliff, was a civil engineer with drainage experience, and he had a technical force under him. They had previously assisted some in repair work in drainage districts in Kossuth County. In the winter and spring of 1936, Iliff, with others at the camp, made a survey of the drains in this joint district. They examined the drainage records, the profiles and such files as were available, with the thought of benefiting the landowners in the district, and of giving work and training for the boys in his camp. He made quite full reports to his superiors in the Bureau of Agricultural Engineering. He and his helpers made

a survey of, and took levels in, the open drains. He made a profile of these drains, not complete in every detail, using the same stations approximately as shown on the original profiles, but numbering the stations in reverse order, that is, station 0 was at the outlet. Neither he nor any other witness was able to find any of the bench marks, or any level or elevation used as a datum or basis of reckoning in the original work. He made a cross section of the main ditch at each of about twenty stations as numbered on his profile from station 710, about 400 feet below the upper end, to station 56 near the outlet, to estimate how much siltage there was in the ditch. He, with members of the boards and the county engineers, attended a meeting of approximately fifty landowners in the district at Ottosen in the spring of 1936, and discussed the matter of cleaning out the open drains. It was the concensus of the landowners attending that the repairs recommended should be made with the proffered assistance of the CCC camp and the Bureau of Agricultural Engineering. According to Iliff's written report to the Bureau, the CCC would furnish 6,822 man days for the work, and the district would furnish materials at an estimated cost of $3,750, engineering expense estimated to cost $500, dragline expense estimated at $10,500, for an estimated total cost to the district of $14,750. There was a joint meeting of the boards at the county seat of Humboldt County on April 17, 1936, attended by all of the five board members of that county and two of the five members from Kossuth County. Iliff was present with his field notes, report to his superiors, and profile. Charles Chubb, a drainage engineer from Algona, was present. It was proposed by Iliff that if the district would furnish one or two dragline excavators with operators, and would furnish such materials as would be necessary, the Federal Government would furnish engineering assistance, equipment, the labor of the boys at the camp, and one operator for one of the draglines on one eight-hour shift for a 44-hour week, and that while the dredge was being so operated during that shift the gas and oil for the machine would be furnished at the expense of the Federal Government, and that the district would be at no expense for this service. The CCC camp would furnish machinery for

leveling the old and new spoil banks, and the labor to operate the machinery, and would also furnish the labor to chop down the trees and underbrush along the ditch, and to pull, grub out or dynamite the stumps and roots, all at no labor expense to the district, if it would furnish the dynamite. The CCC camp would also furnish the labor and superintendence, if the district would furnish the materials, to construct all bulkheads and concrete work, to lay all tile, install floodwater inlets, catchbasins, corrugated pipe tile outlets, and surface water outlets, do all fencing and bridge repairing, and other hand work. At this meeting, a resolution was adopted directing two members of the joint board to enter into a written contract with Iliff or his superiors for these services. Such a contract was later executed. It was called a "supplemental agreement of cooperation on CCC drainage work." It stipulated that the district should deliver materials and supplies as needed, and if it failed to do so the Bureau of Agricultural Engineering could cancel the agreement, and also provided that if the CCC camp was discontinued, the Government would be under no liability for failing to perform the contract. At this meeting Chubb was appointed as engineer of the district to have charge of the work, and aided by the data and profile received from Iliff was directed to prepare specifications as to the work and mail the same with notice of the letting of such cleanout contract to contractors in that vicinity. The boards adjourned to meet again at Algona on April 30, 1936, to let the cleanout contract. There is in evidence a form of proposals to the joint boards for use of bidders. These state the estimated yardage of the cleanout to be approximately 147,000 cubic yards, and state that the bidder may furnish all of the labor, or use CCC labor. The engineer sent notices of the work and the contract letting to eleven contractors engaged in that work. We find no copy of the notice in the record. The notice was not published. There are no Minutes of this meeting of April 30, 1936, in the drainage records of either county, but there is testimony that the meeting was held and that Iliff, Chubb, the County Auditors, and several contractors attended and that five bids were submitted. The lowest bid was that of O. T. Rafdal of Medford, Minnesota,

for 5.5 cents a cubic yard. The next lowest bid was that of John S. Rafdal of Northwood, Iowa, for 6.9 cents a cubic yard. The corrected records of the meeting of May 12, 1936, recite that O. T. Rafdal because of error in his bid withdrew it, and the contract was then awarded to John S. Rafdal. The joint boards entered into a written contract with Rafdal later providing for the beginning of work by May 20, 1936, under the conditions offered by Iliff. The contract had the following "sand clause," to wit:

"In the event that second party encounters sand in extensive quantities in the progress of cleanout operations, said second party shall immediately notify the engineer in charge, who shall, if the emergency appears sufficiently serious to warrant, immediately notify first parties. Then, and in that event, said parties to this contract will arrange to make a proper adjustment of the extra cost of the removal of said sand. No additional payments or compensation will, however, be made to said second party unless under a subsequent written agreement entered into by and between the parties to this contract. In the event that a proper adjustment cannot be made between the parties hereto as to such additional or extra compensation, then this contract shall stand cancelled and be considered null and void, and said second party shall have the right to withdraw from said project."

The evidence shows a considerable number of sand pockets, some of considerable size, along the ditch. Rafdal put two dragline excavators on the job. One had a half-yard bucket, and the other a yard bucket. These dredges operated from one side of the ditch, and deposited the dirt on that side. The contractor furnished all of the labor, except the one operator supplied by the B. A. E. Rafdal was killed early in the summer of 1936, and his wife, as administratrix of his estate, was authorized by the boards to continue the work. Sand was encountered from the start. It would pour into the ditch from the sides and bottom until the sand pocket was empty. Mrs. Rafdal went before the joint boards at a meeting on September 9, 1936, and it was unanimously voted to pay her $4.50 per hour "for

recleaning sand" when the dredge was run by her operator, and $3.25 an hour when operated by Iliff's man, and it was ordered "that a subsequent contract be so drawn." Mrs. Rafdal testified that later she asked the boards for a contract and was told that a contract was not necessary.

The work was under the direct charge of Chubb, although Iliff gave some supervision. It was impossible to tell definitely where the original grade line of the ditch was. Iliff recommended that the original depth, as near as he could estimate it, at the outlet of the 16-inch tile should be lowered about four feet to give adequate outlet to that line of tile and to other lines of tile, extending into a few hundred acres both north and south of the highway between Sections 8 and 17. The original profile for the main ditch shows the depth varied from 4.2 feet to 8.8 feet. The cross sections of the ditch made by Iliff at twenty or more stations showed the probable depth of the siltage to vary from 3.4 feet to 7 feet. The greater depths were in the upper six or more miles of the main ditch. Although Murray, one of the appellees, whose farm is in Humboldt County, testified: "Before the cleanout took place, I saw the ditch and it was pretty well filled. It was a kind of fill which was tapered back in from the banks. I would say there was not much of a berm before the cleanout." The Rafdal dredge began the cleanout about 2,400 feet above the outlet. There was little siltage at that point and for some distance above, and there was little deepening of the ditch for a considerable further distance up. Garrett, who had about ten years' experience as a dragline operator, did some work at the lower end of the ditch. He testified:

"When I was operating the machine from the lower end, I did not excavate any dirt that had been previously unmoved, that is, any original dirt. We just started at zero and there were places we didn't take out hardly the silt. In the upper four and a half miles, there were various places where original dirt—that is, dirt previously unmoved as distinguished from filled-in silt—was taken out. At the deepest, I took out previously unmoved dirt not to exceed two feet in depth. There were several feet of silt in places."

He testified that the depth through this four or five miles ranged from eleven to thirteen feet and the average depth was about twelve feet. The deepest place found by Parsons, an engineer who testified for plaintiffs, and who was a member of the commissions to make the original assessment and the extension assessment, was 11.6 feet, at the highway crossing the ditch between Sections 28 and 29 in Kossuth County. This depth was 5.2 feet greater than the original depth at grade, of the main ditch, at this place. The greatest depth which he found in excess of the original depth at the same place was 5.8 feet. He estimated that his figures of the original depths would not be in error over a few inches. Chubb testified:

"From the bank to the bottom of the ditch, I think would average somewhere in the neighborhood of 12 feet in depth for perhaps 6 or 8 miles, as it was dug by me."

He also testified that the excavating done by Rafdal, and the depth and grade of his digging were keyed to a depth of 4.2 feet below the probable original grade at the upper end of the open ditch.

I. Appellees insist that appellants' "objective was not a restoration of the main ditch to original capacity, but a substitution of a wholly new design," that "the project in Iliff's mind was a complete redesign of the original improvement found by him to be insufficient for drainage of large areas and intended to increase capacity 665 per cent." Isolated statements in the record may be found giving some support for these statements, but an impartial reading of the record as a whole compels us to find that it was never the intention of anybody to completely redesign the original plan of drainage in this district, nor was the condition of the lands or the drains of the district for the greater part such that the establishment of a new district was necessary, as permitted by section 7554. It must be conceded that outlets in the upper part of the main were to be improved, and that some increase in original capacity was contemplated, and there was adequate drainage given to a few hundred acres in Sections 8 and 17, in Garfield Township, which had not been properly served by the original

construction. Other drains were also made to give better service. Iliff testified:

"The original design I will admit did not appear to be of sufficient depth, judging from what datum we could pick up to properly accommodate one slough in particular."

In his report to the B. A. E., he stated:

"It should be noted that besides increasing the capacity as originally constructed, the proposed improvement lowers the original grade line at the headwall approximately 4.3 feet. This provides adequate outlet for the several tile lines. * * * At the bulkhead itself, a main head wall at the upper end, those tile in their condition could not furnish a free outlet without deepening the ditch to give them a better outlet than they had, to keep them free of siltage. The deepening of the ditch was a necessity for the free functioning of the County laterals."

Without setting out other parts of the record which support our conclusion but would unduly extend this opinion, we have no doubt that the record clearly supports our conclusion that resort to section 7554 was unnecessary and would have been unwarranted.

■ II. Section 7556 of the Code provides that the improvement in any drainage district shall at all times be under the supervision of the board of supervisors, whose *"duty"* it shall be "to *keep* the same *in repair* and for that purpose it may cause the ditches, drains, and watercourses thereof to be *enlarged, reopened, deepened, widened, straightened* or *lengthened,* or the location changed for better service, or may cause any part thereof to be converted into a closed drain when considered for the best interest of the public, and in connection with said work may construct settling basins. * * *" (Italics ours.)

Whatever work was done by Mr. and Mrs. Rafdal under their contract was clearly within both the letter and the spirit of this statute. They cleaned out silt and caved-in earth up to seven feet in depth. This was repair work under any interpretation. They also deepened the ditch in parts of its length.

The ditch was widened, but only to remove the old spoil banks which were in a position to fall into the ditch. The statute expressly provides that both deepening and widening are repairs. It was necessary to do both not only to *keep* the ditch *in repair*, but "for better service." The Legislature, by the Code of 1924, substituted these three words for the words "for a better outlet" in section 1989-a21 of the 1913 Code Supplement. The substituted expression has a broader and more inclusive meaning than its predecessor. What was done under the Rafdal contract could be done and was done under section 7556.

On June 3, 1937, the joint boards met in session, and went out and viewed the work done under the Rafdal contract. The Minutes of the meeting state that "the entire 14 miles of cleanout work that is being completed on Joint Drain No. 2 was inspected and approved." The dredge had not quite reached the upper end at that time, and the joint boards voted that the time to finish the work be extended to July 1st. The dredge reached the old bulkhead at the upper end of the main and finished the excavating work on June 10, 1937. The bulkhead had not then been rebuilt. On June 12, 1937, there was an exceedingly heavy rain of seven inches which washed out many of the tile above the bulkhead, flooding the ditch with silt from above, caving in the banks of the ditch, and washing much of the spoil banks into the ditch. The ditch was filled with dirt and debris to a depth of as much as six feet in places. Mrs. Rafdal testified that shortly thereafter she met with the Kossuth board, and they asked her if she would be willing to consider more work consisting of recleaning the ditch of the dirt that had washed in. She told them that she didn't want the work, as her contract had been completed and the work accepted as satisfactory, her insurance was running out, and her bond was expiring. She said the board admitted this, and then proposed to rent her large dredge, and a verbal agreement was then made under which she rented the dredge to the district for $4 an hour on condition that the district hire her operator and mechanic and pay them, and all operating costs. No witness denies that this was done. Garrett testified that he began recleaning the ditch for the district about June 20th, and finished in about five or six weeks. He started at the head wall and "we covered ap-

proximately five miles, in this recleanout work. The flood had caused considerable dirt to wash that we had to remove. We didn't have a good drainage to the head wall and there were spots in the ditch that were filled very near back to where it was before we dug it the first time. We cleaned the entire stretch of approximately five miles. Kossuth and Humboldt County paid me for that work." The Rafdals had nothing to do with any part of the repair work other than excavating in the open drains. In this work they excavated 236,965 cubic yards, as certified by the engineer, not including a large quantity of sand recleaned, and the recleaning of the ditch after the heavy rain. For this recleaning, as we have noted, she was to be paid only rent for the dredge. For all of this work, they received warrants from the district totalling $21,430.72. The final estimate of the engineer for the excavation work done under the written contract alone was given, and the work was approved by him and recommended for acceptance at a meeting of the joint boards on September 27, 1937. The total amount to which Mrs. Rafdal was entitled for the yardage stated at the contract price of 6.9 cents a cubic yard was $16,350.61. The difference between this amount and the total amount of warrants received by them, $21,430.72, is for warrants issued to them for hour work under the sand-cleaning contract, or other hour work, and for rental of the dredge in recleaning the ditch after the heavy rain.

Substantially all of the remainder of the work was done by men from the CCC organization at Bancroft. This consisted of the clearing of the timber and underbrush, constructing three or more concrete bulkheads, reconstructing many tile outlets with corrugated pipes, cleaning and relaying tile back from the outlet, in some instances as far as 70 feet, installing corrugated pipes through the banks above the tile outlets to permit surface waters to empty into the open drains without washing and eroding the banks, installing flood inlets and catchbasins, building a concrete settling well or basin just above the bulkhead at the upper end of the main, and relaying and converging four or five tile lines into the well, and constructing a 32-inch line of tile from the well to the bulkhead, con-

structing a new line of 20-inch tile, with a 26-inch tile outlet into the bulkhead, and extending the 20-inch line up to and across the highway between Sections 8 and 17, with a further extension of 2,500 feet of smaller tile into low land farther north, converting a thousand feet of Lateral "C" on the Edward Wehrspann farm into a closed 20-inch tile drain, and building a new bulkhead to replace the old one, leveling the spoil banks on both sides of the drains, so that much of the right of way could be farmed up to the ditch. An illustration of the value of these services is shown in one instance. The joint boards on September 27, 1937, appointed Chubb to make preliminary survey to relay tile or to deepen the ditch to afford sufficient outlet for the land included in the upper end of the drainage district, which survey included that part of the drain from the old bulkhead to across the highway to the north and included the 16-inch tile and its 2,400 feet extension of 12-inch tile. On November 16, 1937, he reported that the condition of the 16-inch line was such that it would not justify its being relaid and that it would be better to lay a new parallel line consisting of 100 feet of 26-inch tile to the outlet in the head wall, and 1,050 feet of 20-inch tile to and across the highway, and 250 feet of 12-inch tile east along the north side of the highway. The entire job was to be done with CCC labor and machinery. The estimated cost for material was $990.85 to the district and $2,642.05 to the B. A. E. The work was done and later the district ordered the new line extended 2,500 feet with smaller tile. This work was all done.

The cost of this work for floodwater control, repairing the outlets, etc., was large. But a less amount of similar work, recommended by Goodrich in 1912, was estimated to cost $8,520.

The resolution of the joint boards fixed the total assessment for all of the work involved in this litigation at $33,385.32 covering total repair expense, $28,934.52, estimated interest, $3,200, estimated expense in connection with relevy, $1,250.80. It must be noted, however, that other warrants for charges on this work and interest had been previously paid out of the balances in the drainage funds of this district, in amounts of $5,582.70 and $1,472.42, respectively in Humboldt and Kossuth

Counties, under section 7557 of the Code. The total amount of warrants issued for the work in controversy by both counties was $35,065.21, according to our computation from the record. This total does not include accrued interest. It does include warrants paid from the balances in the drainage funds of the district. At least part of this fund in Humboldt County was raised by a 7-per cent assessment earlier ordered levied against the land in the district, but not levied in Kossuth County. We have already in the opinion referred to the respective claims of the parties as to the original cost of the open drains and extension.

In determining whether work done is a repair under section 7556, the comparative cost of the old and the new work may be considered, but it is not controlling. What is of real importance in determining this question must be found in the conditions as they existed, and the nature and purpose of the work done. This court has said that comparative cost is a matter of importance which may be considered in doubtful cases in determining whether the work is a repair. Bloomquist v. Board of Supervisors, 188 Iowa 994, 1001, 177 N. W. 95; Maasdam v. Kirkpatrick, 214 Iowa 1388, 1396, 243 N. W. 145; Hogue v. Monona-Harrison Drainage District, 229 Iowa 1151, 1160, 296 N. W. 204. In Kelleher v. Joint Drainage District, 216 Iowa 348, 353, 249 N. W. 401, 403, we said:

"While the cost of the new improvement is not conclusive in determining whether the work is a repair or not, yet it may be considered on that subject."

But we have also held that "the question of the right, under section 1989-a21, to make repairs is not to be determined by the extent or cost of the work." Board of Supervisors v. Paine, 203 Iowa 263, 269, 271, 210 N. W. 929, 932. And of this factor we said in Petersen v. Sorensen, 192 Iowa 471, 478, 185 N. W. 42, 45:

"It cannot, however, in this case be given greater weight than as a circumstance throwing light upon the question whether it was, in fact, repair work. * * * the engineer reported that the ditch was filled with earth and debris, which would be difficult and expensive to remove."

In Meyerholz v. Board, 200 Iowa 237, 241, 242, 243, 204 N. W. 452, 454, 455, the levee, through the wear and tear of the elements for years was such that its "condition necessitated extensive repair," and "had reached a state of deterioration where it was imperative that it be repaired and restored, in order to be of any practical efficiency or service to perform the work for which it was designed. No change was made in the location in the levee. It was not lengthened. No new lands were occupied. The obvious and sole purpose of the work was to strengthen the levee as built, and restore it so that it would adequately perform the function for which it was constructed. While the work was extensive and necessarily expensive, we think it was authorized as repair work under Section 1989-a21, and that no such 'change' was made as required notice to landowners whose lands were within the levee district, which lands had already been classified and assessed. * * * It is true that the work was extensive in its scope, but this necessarily resulted from the deteriorated and injured condition of the original improvement."

The foregoing statements are particularly and pertinently applicable to the case before us. Each kind and character of work done in this case has been designated and sanctioned as a repair, either by statute, or by decision of this court. Section 7556 expressly states that repairs include enlarging, deepening, widening, straightening, lengthening, converting into a different kind of a drain, and constructing catchbasins. Under the section, the duty of the board is to keep in repair the constructed improvement. It must not wait until the need for repair exists and the damage is done, but it must do what is necessary to prevent such conditions. This was the very purpose of increasing the fall, improving the outlets, constructing bulkheads, with weirs and wings to control the flow of surface waters, installing corrugated pipes through the banks, flood inlets, spillways, catchbasins, and a settling well, all to prevent the erosion and washing of earth, silt and debris of all kinds into the drains. See Board v. Paine, supra (203 Iowa 263, 264, 210 N. W. 929, 930), where the court held that the installation of "corrugated iron pipes, to carry the surface water through the spoil banks

of the open ditch, and also at the ends of certain tiled drains that had discharged into the ditch, as originally constructed, and which had been disturbed by the deepening of the ditch," was keeping the ditch "in repair," under section 1989-a21. Appellees complain that the "recleanout" agreement of Mrs. Rafdal with the Kossuth board, and the "sand clause" agreement with the joint boards were verbal ones, but in the Paine case, supra, we approved "an oral contract with a committee of the joint board," to install the pipes. See also Payne v. Missouri Valley Drainage District, 223 Iowa 634, 638, 272 N. W. 618, 620, 621, where a 240-acre settling basin was abandoned and a new one constructed, and the waters of a creek were diverted to it by a different drain. The appellant there insisted that this was not repair work. We said:

"With this construction of the appellant we cannot agree. The provision for repairs contained in section 7556 undoubtedly had to do with keeping the drainage system in such condition that it would function and perform the service for which it was intended. The power to do this work is not merely a privilege, but the statute imposes on the board the duty *to keep the drainage district in repair.*" (Italics ours.)

In Board v. Paine, supra (203 Iowa 263, 270, 210 N. W. 929, 932), speaking of section 1989-a21, the court said:

"The authority there given was not merely to repair, but to *keep in repair.* We have said that to repair is to 'restore to a sound or good state, after decay, waste, injury, or partial destruction.' Walker v. Dwelle, 187 Iowa 1384. Obviously, then, to keep in repair is to keep in a sound or good state, without such injury or partial destruction. To keep in repair is to keep from getting out of repair. Where the authority is to keep a thing in repair, it cannot be said that it must be out of repair before anything can be done under the authority. * * *

"When the authority of the board is to keep the ditch in repair, we are of the opinion that the taking of effective precautions to prevent erosion of its banks and the deposit of silt in its channel is not beyond the power given."

See also Baldozier v. Mayberry, 226 Iowa 693, 696, 285 N. W. 140; Breiholz v. Board of Supervisors, 186 Iowa 1147, 173 N. W. 1, 257 U. S. 118, 42 S. Ct. 13, 66 L. Ed. 159; Smith v. Monona-Harrison Drainage District, 178 Iowa 823, 826, 827, 160 N. W. 229, 231. As said in the latter case, "The manifest design of the legislature, evidenced in the statute quoted [1989-a21], was to confer adequate authority to conserve all that has been done in the way of making the improvement. * * * it is plain that the supervision and control to be exercised by either body [supervisors or trustees] are not limited to what technically would be deemed making repairs, but include doing all that is authorized in this section to be done."

In Walker v. Joint Drainage District, 197 Iowa 351, 359, 197 N. W. 72, 75, instead of attempting to relay a defective tile line, a new line parallel to the old was laid. In holding this was a repair, the court said:

"It was simply a more efficient and expeditious manner of repairing the old line than to have actually dug it up and replaced it. It also appears to have been less expensive. No new lands are drained. We think that such a method of repair is clearly within the powers of the board of supervisors, under the provisions of Section 1989-a21."

This language applies to the 16-inch tile line and its extension of 2,400 feet of 12-inch tile which were left as they were, because of private line connections, to render what service they could, and a new line of 20-inch and 12-inch tile was laid draining the same territory. The use of CCC labor and equipment greatly reduced the cost of this improvement. The old tile had been in the ground for 25 years and the condition of the tile was such that any salvage would have been of doubtful value. See Kelley v. Drainage District, 158 Iowa 735, 742, 138 N. W. 841. See also Nervig v. Board, 193 Iowa 909, 188 N. W. 17, and Nelson v. Graham, 198 Iowa 267, 197 N. W. 905, where 500 feet of 16-inch tile were replaced by 960 feet of 20-inch tile. This was held to be a repair. In Mathwig v. Drainage District, 188 Iowa 267, 171 N. W. 125, a 12-inch tile was inadequate to carry the drainage, and the construction of a parallel

line of equal size and the enlargement of an intake were held to be repairs.

It is our judgment, that under the record, and under the statute and the decisions of this court, all of the work done was authorized by section 7556 of the Code. Because of the different fact situation in the cases, Lade v. Board, 183 Iowa 1026, 166 N. W. 586; Kelleher v. Joint Drainage District, 216 Iowa 348, 249 N. W. 401; Chicago & N. W. R. Co. v. Board, 187 Iowa 402, 172 N. W. 443; Walker v. Joint Drainage District, 197 Iowa 351 (Division I), 197 N. W. 72; Smith v. Monona-Harrison Drainage District, supra, the decisions therein do not rule the decision in this case, on that issue.

██ III. We come now to the alternative contention of the appellees that if the work is authorized by section 7556, it was of such cost, nature, and/or amount that all of the statutory proceedings required, under those circumstances, by section 7559, should have been taken.

The legislative history of sections 7556 to 7561 will be helpful in construing these sections and particularly section 7559. Section 7556, in its earliest form, was enacted by the 30th General Assembly (section 22, chapter 68) and appeared as section 1989-a21 of the 1913 Supplement to the Code of Iowa, as follows:

"Control—repairs—cost. Whenever any levee or drainage district shall have been established and the improvement constructed as in this act provided, the same shall at all times be under the control and supervision of the board of supervisors and it shall be the duty of the board to keep the same in repair and for that purpose they may cause the same to be enlarged, reopened, deepened, widened, straightened or lengthened for a better outlet, and they may change or enlarge the same or cause all or any part thereof to be converted into a closed drain when considered for the best interests of the public rights affected thereby. The cost of such repairs or change shall be paid by the board from the drainage fund of said levee or drainage district, or by assessing and levying the cost of such change or repair upon the lands in the same proportion that the original expenses and cost of construction were levied and assessed, except

where additional right of way is required or additional lands affected thereby, in either of which cases the board shall proceed as hereinbefore provided; * * *.''

It is found in the same language in the first sixteen lines of section 4861 of the Compiled Code of 1919. In the redraft of chapters 1 and 2 of Title XV of the Compiled Code, as it appeared in Code Commissioners' Bill No. 185, so ably prepared by the Hon. J. C. Mabry, and in Substitute for House File No. 185 prepared by the House Committee on Drainage, and in the enrolled bill signed and approved by Governor Kendall on April 26, 1924, and found in the Laws of Iowa, Fortieth General Assembly, Extra, House Bills, 1924, sections 7556 to 7561 of the 1924 and subsequent Codes, were included in sections 116 and 116-a2. They are as follows:

''Sec. 116. Control—repair—apportionment. When any levee or drainage district shall have been established and the improvement constructed the same shall be at all times under the supervision of the board of supervisors except as otherwise provided for control and management by a board of trustees, and it shall be the duty of the board to keep the same in repair and for that purpose it may cause the ditches, drains, and watercourses thereof to be enlarged, reopened, deepened, widened, straightened or lengthened, or the location changed for better service, or may cause any part thereof to be converted into a closed drain when considered for the best interest of the public. Such repairs shall be paid for out of the funds of the levee or drainage district in the hands of the county treasurer if there be any.

''If such funds are not sufficient and the cost thereof does not exceed ten per cent of the original cost of the improvements in the district a new assessment shall be made on the basis of the old apportionment and no notice of such assessment shall be necessary.

''If the cost thereof does exceed ten per cent of the original cost of the improvements in the district, the board may for good reason order a new apportionment of, and assessment upon, the lands in the district to be made; and the same pro-

ceedings shall be had and the same rules shall be applied as are provided in this act for an original apportionment and assessment; and the same right to appeal shall be given to any interested party.

"If additional land is required in making such repairs or changes then the same proceedings shall be had as to such additional land as are provided in this act for the original establishment of the district and the same rights shall be given all interested parties including the right of appeal from the decision of the board concerning any inclusion of land, damages, apportionment of benefits and assessment for costs.

"Sec. 116-a2. But notwithstanding the provisions of the last preceding section so much of the cost of the work and materials as is required to clean out any specific open ditch or main so as to restore it to its original efficiency or capacity and to preserve its sides at a practical slope must be assessed to the lands in the whole district in the same proportion as the costs and expenses of the construction of such specific open ditch was originally assessed to said lands; and so much of the cost of the work and materials as is required to restore any tile line or lateral to its original efficiency, or to clean any tile line, or to replace broken or defective tile, or to rebuild any bulk head, must be assessed to the lands benefited by such specific tile line or lateral in the same proportion as the original cost thereof."

The two sections were editorially subdivided into sections 7556 et seq. in the 1924 and later Codes, as noted above. Section 7557 provided that the repairs authorized in section 7556 should be paid out of any funds of the district in the hands of the county treasurer. Section 7558 provided that if the funds of the district on hand were insufficient and the cost of the repairs did not exceed ten per cent of the original cost of the improvements in the district a new assessment should be made on the basis of the old apportionment without notice.

Section 7559, in the Codes of 1924 and 1927, provided:

"If the cost thereof does exceed ten per cent of the original cost of the improvements in the district, the board *may for good*

*reason* order a new apportionment of, and assessment upon, the lands in the district to be made; and the same proceedings shall be had and the same rules shall be applied as are provided in this chapter for an original *apportionment* and assessment; and the same right to appeal shall be given to any interested party.'' (Our italics are merely for identification.)

It will be noted that the discretion of the board was not wholly unrestrained in the ordering of a new apportionment and assessment as provided in an original establishment, in the event the cost exceeded ten per cent, but it might do so ''for good reason.'' This was a rather indefinite and uncertain condition leaving the determination of the matter to the judgment of the board. The Forty-third General Assembly by Chapter 209 of its Laws amended section 7559 in 1929 as follows:

''* * * by adding after the word 'district' in line three (3) the following: 'and the nature and/or amount of work proposed differs from mere repairs as defined in section * * * (7561), code, 1927, then'. Said section is further amended by striking the words, 'may for good reason' in line four (4) and by inserting in lieu thereof the word 'shall'; and it is further amended by striking the word 'apportionment' in line * * * (9) and by inserting in lieu thereof the word 'establishment.' ''

By this amendment, it was clearly the intention and purpose of the Legislature to remove the second, and uncertain and rather undeterminable factor of the existing statute, and to substitute for it a definite and determinable factor, to wit: ''the nature and/or amount of work,'' differing from mere repairs as defined in section 7561. In other words, there must be two factors, (1) a cost in excess of ten per cent of the original cost, and (2) work of a nature and/or amount differing from repairs as defined in section 7561. There has been no change in sections 7559 and 7561 since the amendment.

The appellees argue that the word ''and'' just preceding the word ''nature'' should be read as ''or,'' and, therefore, contend that either of the two factors is sufficient to call for the procedure stated in the latter part of section 7561, and that if the cost exceeds ten per cent, that fact alone requires such

procedure. We find no merit in this contention. It is true that we have held in statutory construction that "and" may sometimes be read as "or," and conversely. See State v. Myers, 10 Iowa 448, 449; State v. Brandt, 41 Iowa 593, 614; State v. Smith, 46 Iowa 670, 673; Eisfeld v. Kenworth, 50 Iowa 389, 391; Williams v. Poor, 65 Iowa 410, 415, 21 N. W. 753; Seaton v. Grimm, 110 Iowa 145, 149, 81 N. W. 225; Chicago, R. I. & P. Ry. v. Rosenbaum, 212 Iowa 227, 231 N. W. 646; In re Will of Peterson, 186 Iowa 75, 83, 86, 172 N. W. 206; Ahrweiler v. Board, 226 Iowa 229, 235, 283 N. W. 889; State ex rel. Winterfield v. Hardin County Rural Electric Cooperative, 226 Iowa 896, 916, 285 N. W. 219. Ordinarily in statutory construction the grammatical sense of the words is to be adhered to, unless that sense is contrary to the clear intent and purpose of the statute, or if it would result in an absurdity, or a repugnance or inconsistency in different provisions thereof. State v. Smith, supra (46 Iowa 670, 673). The particular word "and," in the section being construed, must be given the meaning and sense which the law most clearly requires, and that is a conjunctive or copulative sense. To give it the disjunctive meaning of "or" would defeat the purpose of the statute and frustrate the design of the Legislature in amending the section. This is made very apparent since the Legislature used the word "and" in both a conjunctive and a disjunctive sense in the very clause which was inserted into the section by the amendment.

The important question for determination is whether both factors stated in section 7559 are present in this case. It is conceded by all parties that the cost of the improvements made, in its entirety, exceeds ten per cent of the original cost of the improvements and extension, even if the highest cost thereof (total original assessment was $85,782.70) given in the record be accepted as correct. It is also true that the aggregate of the warrants issued for the yardage excavated under the Rafdal contract exceeded such ten per cent. This yardage amounted to $16,350.61.

It is essential that the "work" referred to in section 7559 must be different from *"mere repairs* as defined in section 7561."

Section 7561 is as follows:

"Notwithstanding the provisions of sections 7556 to 7560, inclusive, so much of the cost of the work and materials *as is required to clean out any specific open ditch or main so as to restore it to its original efficiency or capacity and to preserve its sides at a practical slope* must be assessed to the lands in the whole district in the same proportion as the costs and expenses of the construction of such specific open ditch was originally assessed to said lands; and so much of the cost of the work and materials *as is required to restore any tile line or tile lateral to its original efficiency, or to clean any tile line, or to replace broken or defective tile, or to rebuild any bulkhead,* must be assessed to the lands benefited by such specific tile line or tile lateral in the same proportion as the original cost thereof." (Italics supplied.)

The italicized portions of the section define what is a "repair" within its terms. The work and material used, in order to constitute a "repair" must be limited to that which is required to restore the open ditch, main, tile line, tile lateral, or bulkhead, to its original efficiency, capacity, or condition. The statute itself furnishes the definition, and we need look no further, although we think the definition is the ordinary one.

By its very terms section 7556 gives a much broader meaning to a "repair." In fact, that section imposes a duty of "keeping in repair," of doing that which will prevent any part of the improvement from becoming out of repair. It specifically authorizes work to be done which concededly is more than a restoration to its original condition, capacity, or efficiency. We have held, as noted herein, that the repairs authorized are not technically such, and that work done, although different from and in addition to the work as originally constructed, was nevertheless authorized by this section.

In determining whether any separable job or portion of the work in question was or was not a "repair" we are limited by and to the definition thereof as set out in section 7561, and not by the provisions of section 7556, or our decisions thereunder.

Under the Rafdal contract, no doubt much of the yardage

excavated was repair work under the definition of section 7561. That would be true certainly of the siltage and dirt that fell in. But there is no way of ascertaining this yardage, as it was taken out along with the new excavation as the ditch was deepened, and is included in the total yardage certified by the engineer. The latter yardage would not be a repair under section 7561. Whether the cost of removing such excavated material as might properly be called repairs exceeded ten per cent of the original cost of the drainage district improvement is not ascertainable under the record. The same is true of such excavation as could not be called repairs. If the total cost is figured at $80,000 or $85,000, approximately, each might be over ten per cent. It is our judgment that this work under the written contract must be considered as within the provisions of section 7559, and that all statutory proceedings required in the establishment of a new district should have been followed, including preliminary report of engineer, plan, profile, specifications, letting of contract, assessment, etc. Since this was not done, the work was not authorized and any warrants issued therefor and any assessment made to pay the warrants are invalid.

This is the requirement of sections 7559 and 7561 from the language used, and that is the way we have construed them. In Maasdam v. Kirkpatrick, 214 Iowa 1388, 243 N. W. 145, the work done was not "repairs" as defined by section 7561 and it exceeded in cost 10 per cent of the original cost of the improvement. We there said on pages 1397 and 1398 of the Iowa report, pages 148 and 149 of 243 N. W.:

"Moreover, the engineer estimates the cost of the improvement at $2,500. The claim of the intervener has been allowed for $7,500. The total thus estimated is $10,000. Manifestly, this is 10 per cent of $100,000, and more than 10 per cent of the original cost of this ditch, which was $77,842, in round figures.

"Manifestly, under such circumstances and under the provisions of Section 7559, hereinbefore quoted, the board has failed to properly proceed, and it was without jurisdiction. Said Section 7559 provides that under such circumstances 'the same proceedings shall be had and the same rules shall be ap-

plied as are provided in this chapter for an original establishment and assessment.'

"After a very careful examination of the entire record and of the previous holdings of this court, we hold that the proposed improvement is not a repair, but a new construction, and that a petition, notice, and bond, as provided by statute for new construction, were necessary.

"The cost, as estimated, is more than 10 per cent of the original cost of the ditch, and procedure as for an original establishment and assessment was necessary.

"It follows that the board was without jurisdiction, and therefore its acts were null and void."

With respect to the warrants issued to Mrs. Rafdal for removing sand, we think this must be said to have been done under a separate verbal contract, and the cost of this work was less than 10 per cent of the original cost of the improvement. The rental of the dredging machines for the recleanout was a "repair" of the ditch, under a separate verbal contract, after it had been cleaned and deepened under the written contract. The cost was also less than the 10 per cent. Both the warrants issued and the assessments made for these two items of work were authorized by statute and valid.

We have held that a sand or rock clause in an excavation contract, or the removal of such material by contract, on a cost-plus, or a charge-per-hour, basis is valid. See Busch v. Joint Drainage District, 198 Iowa 398, 198 N. W. 789; Gjellefald v. Hunt, 202 Iowa 212, 210 N. W. 122; Gjellefald v. Drainage District, 203 Iowa 1144, 212 N. W. 691; Chicago, R. I. & P. R. Co. v. Town of Dysart, 208 Iowa 422, 429, 223 N. W. 371.

While the greater part of the labor for all of the various other items of improvement was done under an arrangement, or so-called contract, with the CCC or the B. A. E., the materials and supplies used were all procured as needed from many different sellers of material under separate contracts. There is no controversy with these federal agencies. They neither asked, nor received any pay or warrants from the district. The work was not all planned in advance, but much of it at later times. This is true of the new tile lines, and the settling well, at the upper end. Tile line outlets were washed out by the

heavy rain of June 12, 1937. Much of the floodwater protection in the way of corrugated pipe outlets both for tile lines and surface water, inlets, catchbasins, etc., were installed after this heavy rain showed the need of them. Some of this work was repair work proper under section 7561, some was not. The warrants for all of the work not done by the Rafdals were issued in a total amount of approximately $13,000, for the following materials and services, and for the following approximate costs: Engineering, including rodmen, etc., $2,256.94; gas, oil, grease, etc., $631.54; culverts and corrugated pipes, $6,000; cement, sand, "mix," labor in concrete work, $849.11; cement and clay tile, $2,500; dynamite, $709.51; attorney fees, $45.44. There were other items of expense also. It is our judgment, that while the total cost of all of this labor and material exceeds 10 per cent of the cost of the original improvement and extension, the separate and separable contracts for the materials purchased, or labor hired are each less than 10 per cent, and are not within the provisions of section 7559, and the warrants issued and the assessments made for their payment are valid.

IV. Appellees insist that section 7493 applies to this work. This section is as follows:

"Bids required. In case the board shall finally determine that any such changes shall be made involving an expenditure of five thousand dollars or more, said work shall be let by bids in the same manner as is provided for the original construction of such improvements."

Appellants urge that the location of this section, remote from the other sections under discussion herein, indicates that it has no application. Appellees concede that it might have been more appropriately placed, but say that where the Code Editor placed it is not material. Its location may have little bearing on its applicability. Its legislative history gives us some light both on its position in the chapter, and its applicability to the questions before us. When the House Drainage Committee's Bill, being House File No. 185 of the Fortieth General Assembly, passed the House and was messaged to the Senate, section 54 thereof was as follows:

"After a drainage district has been established and the improvements thereof constructed and put in operation, if the board or boards shall find that the original assessments are not equitable as a basis for the expenses of any enlargement, extension or repair thereof which may have become necessary, they shall order a new classification of all the lands in said district by resolution, and appoint three (3) commissioners, one (1) of whom shall be a civil engineer with qualifications as provided in this chapter and two (2) of whom shall be resident freeholders of the county not living within any township into which the improvement extends, and not interested therein nor related to any party whose land is affected thereby, who shall be duly sworn as hereinbefore provided for such commissioners."

Section 55 covered the rules for classification. The Senate amended the bill by striking out both sections 54 and 55, and substituted for the original section 54, the following:

"Sec. 54. Alterations—notice.

"If after the ordering of said repairs or improvements and before the completion thereof, it shall become apparent that the same should be enlarged, strengthened or otherwise changed or alteration in the location should be made for the better service thereof, said board or boards may by resolution authorize such change or changes in said improvement as the engineer may recommend, provided that when any changes are made, all persons whose lands shall be taken shall have been given notice as at the original establishment of said district and have the right to be heard as to damages and appeal as in said chapter provided at the original establishment."

The Conference Committee recommended that the Senate recede from its amendment, and recommended that the original section 54 be amended by striking the comma in line 4 between the words "enlargement" and "extension" and inserting the word "or" between them, and by striking the words "or repair" in the same line. The same amendment was made with respect to the original section 55. The Conference Committee at this time added to section 54 the following:

"In case the board shall finally determine that any such

changes shall be made involving an expenditure of five thousand dollars ($5,000.00) or more, said work shall be let by bids in the same manner as is provided for the original construction of such improvements.''

The bill was passed with these two sections as amended. Section 54 was editorially subdivided into sections 7492 and 7493 in the Code of 1924 and later Codes. It appears to us that the striking of the words ''or repair'' from each section was for the purpose of confining ''any such changes'' to ''enlargements'' and ''extensions,'' other than ''repairs,'' under either section 7556, 7559, or 7561, and that the paragraph added to section 54, now section 7493 of the Code, applies only to such enlargements or extensions, and not to repairs, and that the cost factor in the case before us is fixed and governed by sections 7557 to 7561. We, therefore, hold that section 7493 has no application.

V. Appellees argue that since there was no quorum of the Kossuth County board at the joint meeting of April 17, 1936, what was done at that meeting was without jurisdiction. Without passing upon the effect of this lack of quorum of the Kossuth board, we think it of little consequence. Nothing was done at this meeting other than arranging for the cooperation of the CCC and B. A. E. in performing labor. At all subsequent joint meetings, there was always a quorum of each board present. All work done or materials purchased were authorized or ratified at these meetings. The bills for the materials purchased or work done were usually certified as correct by Chubb, the construction engineer, by Smith, the county engineer of Humboldt County, or by members of either board. The bill was allowed by the respective board to which it was presented, and a copy of it was then sent to the other board and allowed, and a warrant was issued for its share of the bill. While this was not action taken at a meeting of the joint boards, it was of such kindred character that we will not hold it invalidated the warrants thus issued. There is no evidence of any fraud in any of the work done. The boards at a joint meeting held thereafter confirmed and established the assessment to pay all of these bills.

320

We have carefully considered all other matters urged by the appellants and appellees, and find nothing therein to change our conclusions as set out herein. The judgment and decree of the trial court is, therefore, affirmed with respect to the assessment levied to pay the warrants issued for the yardage excavated under the Rafdal contract and paid for at so much a cubic yard. The judgment and decree is reversed with respect to any and all of the assessment, in excess of said sum, levied for the payment of warrants for other work, labor, materials, supplies, rentals or services performed with respect to the improvements under consideration herein, or for other expenses, or administrative costs. The district court is, therefore, directed to render and enter judgment and decree in each of the forty cases involved in this appeal in conformity with this opinion.—Affirmed in part and reversed in part.

OLIVER, HALE, WENNERSTRUM, and STIGER, JJ., concur.

GARFIELD, J., takes no part.