H. Robert **HENDERSON** and Phyllis Henderson, Appellees,

v.

**T.L. MILLIS, Appellant.**

No. 84–849.

Supreme Court of Iowa.

Aug. 21, 1985.

William J. Lillis, Eugene E. Olson, and Peter S. Cannon of Connolly, O'Malley, Lillis, Hansen & Olson, Des Moines, for appellant.

Bruce H. Stoltze of Brick, Seckington, Bowers, Swartz & Gentry, Des Moines, for appellees.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, McGIVERIN, and SCHULTZ, JJ.

UHLENHOPP, Justice.

This appeal involves two instruments relating to restrictions and a preemptive right (right of "first refusal"). Although defendant-appellant presents a number of issues, we consider only those which he presented to the trial court: whether (1) the preemptive right was triggered by sheriff's sale of the property; (2) defendant was a bona fide purchaser for value; (3) plaintiffs-appellees are barred from relief by laches, estoppel, waiver, and consent; (4) the preemptive right violated the rule against perpetuities; and (5) plaintiffs slandered defendant's title.

In 1967 Carl A. and Dorothy Loest acquired a parcel of real property in West Des Moines, Iowa. In 1968 they subdivided it into three lots and recorded a plat entitled Loest Estates. See accompanying rough sketch. The Loests retained Lot 1, sold Lot 2 to another person not involved in this action, and sold Lot 3 to plaintiffs H. Robert and Phyllis Henderson.

When the Hendersons negotiated for the purchase of Lot 3 they discussed with the Loests their concern about privacy for the home they intended to build. The Loest home on Lot 1 was on the front of the lot near Twenty-eighth Street; the Loests gardened the rear of the lot. Lot 3 was quite secluded and the Hendersons desired that it so remain. The Loests had no objection except that they desired to be able to have their children also build on Lot 1, if the children wished to do so. As a result, on November 1, 1968, the Loests and Hendersons agreed upon restrictions and a preemptive right. The agreement was formalized and recorded as follows, so far as pertinent ("the first instrument"):

NORTH

Lot 1

Formerly Loest          Millis

ST.

Lot 3

29TH          Lot 2          Henderson

(Not involved)

## LOEST ESTATES

IT IS THEREFORE GRANTED, AGREED AND CONVENANTED as follows:

1. *Single residence—exception.* That until the provisions of paragraph 2 hereof have been complied with, Grantors' Property [the Loests' Lot 1] shall be only used for single family residence, with usual outbuildings and garages for the use of occupants of such residence, except that a son or daughter of Grantors may erect one additional residence on Grantors property, if, in good faith, such additional residence is erected to be occu-

pied by such son or daughter for a period of not less than two (2) years after completion thereof, and in such event Grantors may sell such portion of said lot to be used free and clear of the right of first refusal provided in paragraph 2 hereof.

2. *First refusal.* In the event that Grantors elect to sell a portion of Grantors Property for the erection of an additional residence to any party not a son or daughter as hereinabove provided in paragraph 1, then, in that event, Grantors shall serve upon the Grantees a Notice in writing of the price and the exact

terms of any bona fide offer and of the intention of the Grantors to accept the same, and, thereafter, Grantees shall have the right for thirty (30) days to purchase the portion of Grantors Property subject to said offer, for the purchase price and on the conditions specified in the Notice, but if the Grantees shall not within the said period of thirty (30) days give written notice to Grantors of the election to acquire the property being sold on the terms and conditions set forth in said Notice, the Grantors may then sell such property as provided in the offer upon the same terms and conditions and for the price set forth as included in said Notice.

3. *Binding effect.* The provisions hereof shall be binding upon the heirs, successors and assigns of Grantors and the rights granted, restrictions imposed, agreement and covenants shall run with the following described property located in Polk County, Iowa, to-wit:

Lot 1 Loest Estates, an Official Plat, now included in and forming a part of the City of West Des Moines, Iowa,

and shall inure to the benefit of the heirs, successors and assigns of Grantees, and the subsequent owners of the following described property located in Polk County, Iowa, to-wit:

Lot 3 Loest Estates, an Official Plat, now included in and forming a part of the City of West Des Moines, Iowa.

This instrument placed the onus on a grantor to give the thirty-day notice in case of an election to sell a portion of Lot 1 for the erection of an additional residence; it did not place the burden on the Hendersons or their heirs, successors, or assigns to search out such sales.

The Loest children did not build on Lot 1. In 1973 Mr. Loest died. Thereafter Mrs. Loest sold Lot 1 to Mr. and Mrs. Lyman J. Clark, who moved into the Loest home. In 1976 the Clarks granted a mortgage on Lot 1 to First Federal State Bank.

In 1977 the Clarks obtained a variance from the city for a driveway along the north side of the front portion of Lot 1,

which would open up the rear portion of the lot. They did not however erect a home on the rear portion.

In 1978 the Clarks conveyed to Mr. and Mrs. Lawrence Woods the front (west) portion of Lot 1 with the Loest home on it. The Woods occupied that home, and later sold this part of Lot 1 to Lynn N. Husband who currently owns it and occupies the home. No one gave the Hendersons notice of these transactions.

In 1978 the Clarks quit-claimed the rear (east) portion of Lot 1 to First Federal. They did not give the thirty-day notice to the Hendersons, and the Hendersons were unaware of this transaction until the present litigation. First Federal did not erect a home.

Later in 1978 Laurence R. and Susan Saub became interested in the rear portion of Lot 1, but the Hendersons' preemptive right was involved, as acknowledged by both First Federal and the Saubs. The Saubs negotiated with the Hendersons about the house they desired to build and persuaded the Hendersons to modify the first instrument to permit them to build a home on the rear portion of Lot 1. The Hendersons as first parties entered into the following written agreement with the Saubs, second parties ("the second instrument"):

NOW, THEREFORE, IT IS HEREBY GRANTED, AGREED AND CONVENANTED as follows:

1. *Second parties' Right to Build— Limitation.* In the event that the Second Parties shall erect a single family residence for their personal use, with the usual out buildings and garages for the use of the occupants of such residence, which residence shall be erected on the property being acquired by Second Parties, in such manner that the main structure thereof does not extend east of a north-south line located 322 feet east of the west boundary line (28th Street) of said property as above described, then in such event First Parties do by execution hereof acknowledge that the Grant of Right of First Refusal as recorded in

Book 3993 at Page 137 in the office of the Recorder, Polk County, Iowa, shall be deemed null and void and no longer of any force and effect.

2. *First Refusal.* In the event that the Second Parties should neglect or fail to build the residence for the purpose and in the manner as provided for in the previous paragraph, then the Right of First Refusal granted to the First Parties in the instrument recorded in Book 3993 at Page 137 shall be in full force and effect and accordingly the First Parties shall be entitled to notice and Right of First Refusal, all as provided in said instrument.

3. *Binding Effect.* The provisions hereof shall be binding upon the heirs, successors and assigns of Second Parties and the rights granted, restrictions imposed, agreements and covenants shall run with the following-described property located in Polk County, Iowa, to-wit:

Lot 1 (except the South 115 feet of the West 215 feet thereof) LOEST ESTATES, an Official Plat, now included in and forming a part of the City of West Des Moines, Iowa.

First Federal then conveyed the rear portion of Lot 1 to the Saubs.

In 1980 the Saubs granted a mortgage to First Federal covering the rear portion of Lot 1. They did not build a home, however, and in 1981 they conveyed the rear portion of the lot to James H. and Carma J. Hinkel; this deed recited a consideration of less than $500. The Hendersons were again unaware of transfer until the present litigation; the Saubs did not give them a thirty-day notice. The Hinkels did not build on the property.

Subsequently First Federal commenced a mortgage foreclosure action against the Saubs and Hinkels and other parties who claimed liens on the rear portion of Lot 1. The Hendersons were not parties to the action and were not notified of it; First Federal's attorney was of the opinion that a foreclosure sale would not trigger the Hendersons' preemptive right.

Still later in 1981 a court entered a foreclosure decree directing the sale of the rear portion of Lot 1. The sheriff sold the property on January 22, 1982. At the sale, defendant T.L. Millis, who desired to acquire the property for the construction of a home, was the successful bidder at $21,500 plus costs.

The Hendersons did not learn of the foreclosure and sale until the sheriff's certificate had issued. They commenced this action against Millis seeking various forms of relief including judgment quieting title and declaring the parties' rights. They claim their preemptive right was activated by the foreclosure sale to Millis. In response, Millis denied that the Hendersons have a right to buy the property and counterclaimed for slander of title.

The trial court found for the Hendersons and ordered that Millis transfer title to the property to the Hendersons upon their paying him $21,500. The court denied Millis' counterclaim for slander of title.

Millis appealed. The action is in equity and we review de novo. *Elkader PCA v. Eulberg,* 251 N.W.2d 234, 236 (Iowa 1977).

I. *Activation of preemptive right.* The second instrument stated that if the Saubs did not build a home, the first instrument "shall be in full force and effect. . . ." The Saubs did not build a home, and conveyed the property to the Hinkels. The first instrument therefore was again in operation.

At all relevant times the front part of Lot 1 contained the Loest house, but the rear part was unimproved. Under the first instrument, the preemptive right activated if the Loests or their heirs, successors, or assigns "elect to sell" a portion of Lot 1 "for the erection of an additional residence. . . ." Pursuant to the foreclosure decree, the sheriff conveyed the rear part to Millis. This purchase by Millis was for the erection of a home. Hence this conveyance activated the preemptive right *if* that right is activated by an involuntary sale. No evidence appears that the foreclosure sale was "rigged" to evade the first instrument.

Several courts have considered the question whether an involuntary sale triggers a right of preemption. *See* Annot., 17 A.L.R.3d 962 (1968). We think the answer in a given case turns on the language creating the right. *Kowalsky v. Familia,* 71 Misc.2d 287, 336 N.Y.S.2d 37 (1972) (preemptive right existed whenever grantee offered the property for sale—not triggered by condemnation of the property by county); *Blankman v. Great Western Food Distributors, Inc.,* 57 Misc.2d 754, 293 N.Y.S.2d 368 (1968) (first refusal would come into play when owner offered premises to others); *Draper v. Gochman,* 400 S.W.2d 545 (Tex.1966) (foreclosure sale does not indicate "desire to sell" as stated in preemptive right clause); *see In re Rigby's Estate,* 62 Wyo. 401, 167 P.2d 964 (1946). Two cases cited by the Hendersons initially appear to be contra to these decisions but, on close examination, they are distinguishable. *Price v. Town of Ruston,* 171 La. 985, 132 So. 653 (1931) (interpretation of the particular language); *Cities Service Oil Co. v. Estes,* 208 Va. 44, 155 S.E.2d 59 (1967) (owners themselves petitioned probate court to sell property).

The instant preemptive right is couched in terms of a choice: in the event that grantors "elect to sell." We give words their ordinary meaning unless a different intent is indicated. *Pappas v. Bever,* 219 N.W.2d 720, 721 (Iowa 1974). "Elect" means "to select, to choose, carefully selected: *Chosen.*" Webster's New Collegiate Dictionary 362 (1981).

The Saubs and Hinkels were in default to First Federal, which foreclosed. The foreclosure statute provides that when judgment is rendered for the debt the court "must direct the mortgaged property ... to be sold to satisfy the [debt]." Iowa Code § 654.5 (1983). The debtor has no choice. We conclude that the Hinkels, who held title, did not "elect to sell", and that the foreclosure sale did not activate the Hendersons' preemptive right.

II. *Bona fide purchaser.* In general, preemptive rights are valid and enforceable. *Myers v. Lovetinsky,* 189 N.W.2d 571, 574 (Iowa 1971); *Mercer v. Lemmens,* 230 Cal.App.2d 167, 170, 40 Cal. Rptr. 803, 805 (1964); *New Haven Trap Rock Co. v. Tata,* 149 Conn. 181, 186, 177 A.2d 798, 800 (1962); *Barling v. Horn,* 296 S.W.2d 94, 97 (Mo.1956); *Beets v. Tyler,* 365 Mo. 895, 902, 290 S.W.2d 76, 80 (1956); *Kershner v. Hurlburt,* 277 S.W.2d 619, 623–24 (Mo.1955); *Martin v. Lott,* 482 S.W.2d 917, 920 (Tex.Civ.App.1972).

Millis argues, however, that he had no actual or constructive knowledge of the second instrument and therefore is not bound by it. Hence, he says, he took title to the rear portion of Lot 1 clear of the Hendersons' right of preemption. His argument is that the second instrument was recorded before the Saubs acquired title to the property; thus the Saubs were not in the chain of title at the time of the recording of that instrument. He cites the rule that when a mortgage by a purchaser to a lending institution is recorded before the deed from the vendor to the purchaser is placed of record, the record of the mortgage does not give constructive notice to subsequent purchasers in states like Iowa which have the alphabetical system of indexing. Iowa Land Title Standard 7.2 (Iowa State Bar Ass'n 1984); 59 C.J.S. *Mortgages* § 260 (1949).

Millis' argument fails for two separate reasons. At the time Millis purchased the property, the second instrument was no longer in effect; the Saubs had conveyed the property to the Hinkels without having erected a home. The first instrument, of which Millis had both actual and constructive notice, was in effect. The first instrument is the one which gives the Hendersons their right of preemption and under which they claim that right. Whether Millis had notice of the second instrument is irrelevant. That instrument can be entirely eliminated from the case, and the Hendersons have their preemptive right.

The second reason Millis' argument fails is that in any event, Millis did have constructive notice of the second instrument, as it was given by the Hendersons and they

were not strangers to the record. Real estate instruments are indexed by both grantor and grantee. Iowa Code § 558.49. The Loests were the original owners of record of Lot 1. When the first instrument was recorded the Loests were grantors and the Hendersons were grantees; the instrument would be so indexed. A record searcher would look under the Henderson name for assignments of or amendments to that instrument, and would find the Henderson-Saub second instrument. Title standard 7.2 has no application here. We do not find merit in Millis' argument.

■ III. *Laches, estoppel, waiver, consent.* Millis asserts that the Hendersons lost their preemptive right by laches, estoppel, waiver, and consent. *See Thodos v. Shirk,* 248 Iowa 172, 184–86, 79 N.W.2d 733, 740–41 (1956); 20 Am.Jur.2d *Covenants, Conditions and Restrictions* § 273 (1965); 21 C.J.S. *Covenants* § 119 (1940). These issues are largely factual. We first review the transactions involved.

The Hendersons acquired their right of preemption from the Loests in November 1968. The period that the Loests thereafter owned Lot 1 was uneventful; their children did not build an additional home and the Loests did not sell the rear portion of their lot to anyone. After Mr. Loest died, Mrs. Loest sold entire Lot 1 to the Clarks, who then lived in the former Loest house. The first instrument requires that the seller give notice to the Hendersons of a proposal to sell a portion of Lot 1 for the erection of an additional home. No such sale was made or notice was given. The Hendersons had no occasion to take action.

In 1977 the Clarks obtained a variance from the city for a driveway along the north side of the front portion of Lot 1. This would open up the rear portion of the lot. They did not, however, erect a home on the rear portion. The Hendersons were unaware of the grant of a variance, but they could not have prevented it anyway. The Clarks were prohibited from building an additional home on Lot 1 by the restrictions in paragraph 1 of the first instrument and also apparently by zoning. They could

not build without both a clearance from the Hendersons and a variance from the city. A variance from the city would not give the Clarks a clearance from the Hendersons any more than a clearance from the Hendersons would give the Clarks a variance from the city. The variance from the city, had the Hendersons known about it, would not have called for action by them. It did not trip their preemptive right under the language of the first instrument.

In 1978 the Clarks conveyed the front portion of Lot 1 containing the home to the Woods, and the Woods later conveyed this portion to Husband. These conveyances did not trigger the preemptive right, as they were not sales of a portion of Lot 1 "for the erection of an additional residence"; the front portion conveyed was already improved by the Loest house. No notice was given the Hendersons under the first instrument, and again they had no occasion to take action.

Also in 1978 the Clarks quit-claimed the rear portion of Lot 1 to First Federal, which held a mortgage on it. Nothing appears to indicate this transfer was for the erection of a home, no notice was given the Hendersons under the first instrument, and again no action by them was called for.

In addition in 1978, the Saubs entered the picture. They did in fact desire to build a home on the rear portion of Lot 1. In the second instrument the Hendersons expressly gave them the right to do so, failing which the first agreement would be in full force. The Saubs did not build but instead in 1981 they transferred the rear portion to the Hinkels, whereupon the first instrument was reinstated. Nothing appears to indicate the transfer to the Hinkels was for the erection of a home, no home was erected by the Hinkels, no notice was given the Hendersons as required by the first instrument, and no action was required of them.

In 1981 First Federal foreclosed its mortgage on the rear portion of Lot 1, Millis bought the property at the sale for the erection of a home, and, although the Hendersons were not given notice under the first agreement, they attempted to exercise

their right of preemption, failing which they commenced this action.

■ Laches consists of unreasonable delay in asserting rights which causes another undue prejudice, proven by clear and convincing evidence. Mere passage of time is not enough, and the doctrine ordinarily does not apply within the period of the statute of limitations. *First Federal Savings & Loan Ass'n v. Blass*, 316 N.W.2d 411, 414 (Iowa 1982); *Moser v. Thorp Sales Corp.*, 256 N.W.2d 900, 908 (Iowa 1977); *Cullinan v. Cullinan*, 226 N.W.2d 33, 36 (Iowa 1975). Estoppel, which must be established by clear, convincing, and satisfactory evidence, requires proof of a false representation or concealment of material facts by the actor, lack of knowledge on the part of the other person, intention by the actor that the representation or concealment be acted on, and reliance by the other person to his prejudice. *Anita Valley, Inc. v. Bingley*, 279 N.W.2d 37, 41–42 (Iowa 1979); *DeWall v. Prentice*, 224 N.W.2d 428, 430–31 (Iowa 1974). Waiver and its cousin, consent, require proof of voluntary and intentional relinquishment of a known right. *In re Guardianship of Collins*, 327 N.W.2d 230, 234 (Iowa 1982); *Anderson v. Low Rent Housing Comm'n*, 304 N.W.2d 239, 249 (1981).

Upon examination of the facts of the case, we agree with the trial court that Millis has not established these defenses.

■ IV. *Rule against perpetuities.* Millis asserts that the first instrument violates the rule against perpetuities and is therefore void. The Hendersons rely on the doctrine of partial invalidity and on section 558.68 of the Iowa Code. We believe, as the trial court held, that section 558.68 governs the case and that the partial invalidity doctrine need not be considered. While the rule against perpetuities does not ordinarily apply to restrictions on the use of land, 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 183 (1965), it does apply to grants of preemptive rights. *Trecker v. Langel*, 298 N.W.2d 289, 291 (Iowa 1980); 61 Am.Jur.2d *Perpetuities and Restraints on Alienation* § 65 (1981);

70 C.J.S. *Perpetuities* § 13c (1951). *Cf.* Note, *Direct Restraints on Alienation in Iowa*, 22 Drake L.Rev. 342, 349 (1973) (related subject of restraints on alienation). The restriction on use in paragraph 1 of the first instrument and the preemptive right as the means of enforcement in paragraph 2 are tied together, and we deem them to come within the scope of the rule against perpetuities.

Iowa formerly had the traditional type of rule against perpetuities, but in 1983 adopted the "wait and see" approach. 1983 Iowa Acts ch. 20, now Iowa Code § 558.68 (1985). *See* Kurtz, *The Iowa Rule Against Perpetuities—Reform at Last, Restatement Style: Wait-and-See and Cy Pres*, 69 Iowa L.Rev. 705 (1984); Kurtz, *The Iowa Rule Against Perpetuities: A State of Little or No Law*, 65 Iowa L.Rev. 177 (1979). This statute provides in section 558.68(1) and (2)(a) so far as relevant:

1. A nonvested interest in property is not valid unless it must vest, if at all, within twenty-one years after one or more lives in being at the creation of the interest and any relevant period of gestation.

2. a. In determining whether a nonvested interest would violate the rule against perpetuities in subsection 1, the period of the rule shall be measured by actual events rather than by possible events, in any case in which that would validate the interest. . . .

Under prior law, if the preemptive right had run only to the two Hendersons, or if it had run to them and to their heirs, successors, and assignees for twenty-one years after the death of the survivor of the two Hendersons, the right would not have violated the rule against perpetuities; it would have activated or terminated within a life in being and twenty-one years.

The first instrument, however, does not so read. It extends the right to the Hendersons and their heirs, successors, and assigns. The right therefore purports to exist in perpetuity; it might not activate until more than twenty-one years after the

death of the survivor of the Hendersons, or never activate. Under section 558.68 of the former Iowa Codes this would have invalidated the right from the beginning—assuming the partial invalidity rule to be inapplicable.

The General Assembly, however, made the new act both prospective and retrospective. 1983 Iowa Acts ch. 20, § 1(4) ("This section is applicable to all nonvested interests created on, before, or after July 1, 1983."). The act, including the wait and see provision, therefore applies to the case before us.

The triggering event under the first instrument is an election to sell a portion of Lot 1 for the erection of an additional residence. As seen, that event may or may not occur within the lifetime of the survivor of the Hendersons plus twenty-one years. If it in fact occurs within that period, the first instrument does not violate the rule against perpetuities by virtue of the wait and see provision; otherwise the first instrument does violate the rule and is invalid.

At present both Hendersons are alive. The first instrument is therefore in effect under the wait and see clause. The trial court correctly so held.

In view of our application of wait and see in section 558.68(2)(a), we do not address the issue of whether the first instrument could be reformed under the cy pres principle in section 558.68(3).

■■■■ V. *Slander of title.* The issue we must decide on Millis' counterclaim for slander of title is whether, on the evidence, Millis established his alleged cause of action. This tort requires proof of (1) uttering and publication of slanderous words (2) which were false (3) and were uttered maliciously (4) resulting in special damages to the plaintiff (5) who had an estate or interest in the property slandered. *Witmer v. Valley National Bank,* 223 Iowa 671, 673, 273 N.W. 370, 371 (1937). The trial court found inter alia that Millis failed to sustain his burden of proof on his counterclaim. On our de novo review we

arrive at the same finding. We need go no farther than the element of malice.

The pivotal utterances which Millis relies on occurred in or in connection with the Hendersons' litigation against him based on the two instruments. The Hendersons claimed that the foreclosure sale of the rear part of Lot 1 and the Saubs' failure to build triggered their right to purchase that property. The trial court upheld their claim, although we have now held that the preemptive right has not been activated.

The question is whether Millis proved by a preponderance of the evidence that the Hendersons maliciously asserted their claim under the instruments in or in connection with the present litigation. This court stated in *Miller v. First National Bank,* 220 Iowa 1266, 1269, 264 N.W. 272, 274 (1935):

> It is also laid down in such an action that malice is a necessary ingredient to entitle plaintiff to recover; that it is the gist of the action; that it cannot be maintained if the claim was asserted by defendant in good faith, and if the act complained of was founded upon probable cause or was prompted by a reasonable belief, although the statement may have been false.

*See also Guldberg v. Greenfield,* 259 Iowa 873, 886, 146 N.W.2d 298, 306 (1966) (plaintiff mistakenly stated he had mechanic's lien on the property—court held that "he made the statements in good faith" so that "they were not slanderous"); 50 Am.Jur.2d *Libel and Slander* § 544 (1970); 53 C.J.S. *Libel and Slander* § 274 (1948).

Upon our de novo review of the record we hold on the facts that Millis did not establish the element of malice. The trial court properly dismissed the counterclaim.

■■■ In what posture do these conclusions leave the case? At all material times the first instrument containing the restrictions and the preemptive right was of record; the subsequent grantees had both constructive and actual knowledge of it. Moreover, by express clause that instrument ran with the land and bound subsequent heirs, successors, and assigns. Thus

the subsequent conveyances of Lot 1 or the rear portion of Lot 1, including the conveyance to Millis, were subject to the first instrument. The fact that Millis purchased at a sheriff's sale does not change the result; a sheriff's sale does not cut off rights of which the purchaser has actual or constructive notice—and Millis had both. *Moser v. Thorp Sales Corp.*, 256 N.W.2d 900, 911 (Iowa 1977). A buyer with notice at an involuntary sale stands in the shoes of the prior owner and is subject to a prior preemptive right. *Draper v. Gochman,* 400 S.W.2d 545, 547 (Tex.1966).

The result is that Millis acquired his title subject to the first instrument. While the sheriff's sale did not trigger the preemptive right, neither did it void that right. Millis purchased the title, however, with his eyes open. He gambled that he could overthrow the first instrument, and he lost. Under the first paragraph of the first instrument, Lot 1 can only be used for a "single family residence, with usual outbuildings and garages for the use of occupants of such residence...." But Lot 1 already has such an improvement—the Loest home—and therefore Millis (and his heirs, successors, and assigns) cannot build another home. Millis can possess the property he has bought as his predecessors in title did; the preemptive right has not been triggered as of this time. He can also sell the property if the sale is not for the erection of an additional residence; his purchaser will then stand in his shoes. But if Millis elects to make a sale for the erection of an additional residence to anyone other than a son or daughter of the Loests for the son's or daughter's occupation not less than two years, the Hendersons or their heirs, successors, or assigns will have the first right to buy on the same terms, and Millis must give them their thirty-day notice. If they do not give a responsive notice of acceptance within thirty days, however, Millis will own the property free and clear of the first instrument.

The first instrument will remain in effect for the life of the survivor of the two Hendersons plus twenty-one years and will then terminate, unless the preemptive right is sooner triggered or the first instrument is modified or released by the Hendersons or their heirs, successors, or assigns.

We affirm the trial court's holding that the preemptive right is enforceable but we reverse its holding that the sheriff's sale triggered the right.

AFFIRMED IN PART, REVERSED IN PART.