T. Richard HICKS, Dolores M. Hicks, Richard Blackford, Delores Blackford, Dale & Irene Hackbarth Farms, Inc., Harold Tripp, Addie Tripp, Delvern Korth, Marilyn Korth, Loretta C. Paulsen, Virgil Lemke, Ardis Lemke, Neva M. Stover, Jon Korth, Stacey Korth, Erma M. Reid, Lynette S. Meyer, Bruce D. Reid, Ideal Development & Investment Corporation, Laverne Oleson, Charolette Meyer, Carol Peterson and Verner Peterson, Appellants,

v.

FRANKLIN COUNTY AUDITOR, Franklin County Board of Supervisors and Drainage District # 48 Board of Trustees, Appellees.

No. 93–258.

Supreme Court of Iowa.

March 23, 1994.

Robert W. Goodwin, of Goodwin Law Office, P.C., Ames, for appellants.

Lawrence B. Gilchrist, of Gilchrist Law Office, Hampton, and Roberta M. Anderson, of Schroeder, Anderson & Rourick, Mason City, for appellees.

Considered by CARTER, P.J., and NEUMAN, SNELL, ANDREASEN, and TERNUS, JJ.

ANDREASEN, Justice.

This is a drainage case. Plaintiff landowners in the drainage district filed suit against the county auditor, the county board of supervisors, and the drainage district board of trustees to compel a reclassification of property subject to assessments for the costs of a 1990 construction project. They alleged that notice of the proposed project was deficient, that the project was improperly classified as a repair, and that they were entitled to compensation for all of the property taken for the drainage easement. Following a bench trial, the court ruled that the notice requirements were met, the project was properly considered a repair, and that plaintiffs failed to establish their equitable claims. The court directed the defendants to institute

condemnation proceedings for the property taken which exceeded the original right-of-way boundary. Plaintiffs appealed. We affirm.

### I. *Background and Factual Proceedings.*

Drainage District No. 1 (district) was established in February 1906 by the board of supervisors (board) of Franklin County, Iowa. It consisted of an open ditch with a bottom of four feet across and a side slope of one and one-half to one. The width at the top of the ditch depended on the depth of the ditch at any particular location. At a depth of nine and one-half feet the width at the top of the ditch would be approximately thirty-two and one-half feet. The minutes from subsequent meetings of the board indicated that the planned width at the top of the ditch would have to be increased in some places to avoid slopes that would be too steep to construct.

In 1916 the board appointed an engineer to survey the district. He reported that the district was "inadequate, insufficient, and out of repair." The board then authorized further construction on the district and it was renumbered No. 48. A bulkhead was built between sections three and four of the original plans. The area south of the bulkhead remained an open ditch with a bottom width of six feet and side slopes of approximately one and one-half to one. Tile was installed north of the bulkhead and thirty-seven laterals were constructed. After installation of the tile along the main ditch, the plans called for back-filling to a grade line as shown on the profile. The construction created a surface waterway above the tile line. The actual side slopes of the improvements were not specified in the 1916 plans except for a notation that they were to be no "steeper than 3 vertical to 10 horizontal." Construction on the drainage district improvements was completed in 1917.

During the period between 1917 and the late 1930s the surface waterway north of the bulkhead became partially filled in. The parties dispute when and how the waterway was filled in, by whom, and to what extent. Several of the plaintiff landowners north of the bulkhead testified that the drainage ease-ment had been farmed with row crops since the early 1940s.

No additional work was done in the district until 1952 when the open ditch south of the bulkhead was cleaned out. The open ditch was again cleaned out in 1983. At that time the entire district was reclassified and the assessments were apportioned among the landowners along the main line and the laterals.

In the 1980s, an extensive federally funded construction project, the Morlee watershed project, was planned for several drainage districts, including district No. 48. Improvements to the main tile and eight laterals were recommended. The board notified affected landowners in the fall of 1987 of the proposed improvements to the district. After a hearing on a remonstrance filed by a group of landowners against the project, the board voted to dismiss all further proceedings on the Morlee project.

In April 1989 six landowners in the district petitioned the board to reactivate the plans for the Morlee watershed improvements. A hearing was held in July, and in August the board voted to take no further action on the petition. Late in August two landowners, who lived north of the plaintiffs, asked the board to look into what repairs were necessary to the tile lines in the district. The board then authorized an engineer, Brent Johnson, to investigate the petition for repairs. In early January 1990 Johnson presented his report on proposed repairs and improvements to the main tile and to lateral No. 17. The report set forth four options; option one was labeled a repair, while others were labeled improvements.

Next, the county auditor prepared notice of a public hearing on the proposed drainage projects. Notice was published in the local newspaper and mailed to forty-one of the district landowners. The first hearing on the project was held on February 20. At that hearing Johnson indicated the landowners south of the bulkhead would not be assessed any costs of the construction. The discussion was continued to March 5 and notice was given on the rescheduled hearing. In March the hearing was again continued to April to

permit additional research and discussion on the issue of cost assessments. When the hearing reconvened on April 9 the board voted to proceed with the repair option. Those present at the April meeting were informed that the landowners to the south of the bulkhead would be assessed for the costs of the repair project. The board approved a bid for construction in early November and work on the project commenced soon thereafter.

On November 26, 1990, landowners Richard and Delores Blackford filed an action in Franklin County raising a number of challenges to the 1990 project. *See* Iowa Code §§ 468.83–.84 (Supp.1989). On January 22, 1991, twenty-three landowners, including the Blackfords, filed a petition for a writ of mandamus also challenging the drainage district proceedings. *Id.* § 661.1. These plaintiffs also filed petitions appealing from the board's denial of damages arising from the construction and from denial of their objections to cost assessments made in conjunction with the project. Two additional plaintiffs later intervened in the mandamus action. In February 1992 the district court ordered the two cases consolidated. The plaintiffs then filed a recast consolidated petition on June 1, 1992. A trial to the court was held in September 1992 and judgment was entered for the defendants on all claims except compensation for the expansion of the drainage easement. This appeal followed.

On appeal the plaintiffs contend the court erred in (1) determining that notice to forty-one of seventy landowners in the drainage district was sufficient; (2) finding that the 1990 project was a repair rather than an improvement; (3) rejecting their claims for compensation for the easement right-of-way under theories of adverse possession, estoppel, or laches; and (4) failing to order a reclassification for equitable reasons. We will detail additional facts as they pertain to the arguments presented.

## II. *Standards for Review.*

■ This consolidated action involves both a direct appeal from the board's proceedings and a collateral attack on the actions of the board and the auditor by writ of mandamus.

*See* Iowa §§ 468.83–.84, 661.1. Such actions are tried as equitable proceedings. *Id.* §§ 468.91, 661.3; *Fitzgarrald v. City of Iowa City,* 492 N.W.2d 659, 663 (Iowa 1992); *Ioerger v. Schumacher,* 203 N.W.2d 572, 574 (Iowa 1973). Our review is therefore de novo. Iowa R.App.P. 4.

When reviewing drainage proceedings of boards of supervisors we have applied three principles: the drainage statutes shall be liberally construed for the public benefit; strict compliance with statutory provisions is required to establish a drainage district, while substantial compliance is sufficient as to repairs or improvements; and the procedural requirements should not be too technically construed. *See, e.g., Voogd v. Joint Drainage Dist. No. 3–11,* 188 N.W.2d 387, 390 (Iowa 1971). With these principles in mind, we turn to the legal issues presented.

## III. *Notice of Hearing.*

County boards of supervisors possess the authority to establish a drainage district and to construct whatever is necessary for the public health, convenience, or welfare. Iowa Code § 468.1. The legislature has declared that "drainage of surface waters from agricultural lands and all other lands or the protection of such lands from overflow shall be presumed to be a public benefit...." *Id.* § 468.2. Once a drainage district has been established, the improvement remains under the control and supervision of the board of supervisors or a board of trustees, and the board has the duty to keep the improvement in repair. *Id.* § 468.126(1).

■ Plaintiffs first contend the board's proceedings on the 1990 project were void for lack of jurisdiction because the county auditor failed to comply with the statutory notice provisions. *See* Iowa Code §§ 468.14–.18. Notice is required if the estimated costs of a repair or an improvement exceed a certain dollar amount or a percentage of the original cost of the improvements. *Id.* § 468.126(1)(c), (4)(a). The parties agree that notice of the proposed construction was necessary in this case.

■ Section 468.14 provides that notice of a proposed repair or improvement must

be given to the owner of each tract of land or lot within the proposed levee or drainage district as shown by the transfer books of the auditor's office ... and to all lienholders or encumbrancers of any land within the proposed district without naming them, and also to all other persons whom it may concern, and without naming individuals all actual occupants of the land in the proposed district....

Unless notice is made by personal service, on a designated agent, or is waived, it must be made by ordinary mail and publication. *Id.* §§ 468.15–.18. These methods comport with the constitutional requirements of due process. *See Mammel v. M & P Missouri River Levee Dist.*, 326 N.W.2d 299, 303–04 (Iowa 1982).

Here, the auditor published notice and mailed notice to forty-one "primary" landowners as shown by the transfer books. All co-owners of each tract of land were listed on the envelopes. Thus, if several individuals owned a single tract, one notice was mailed to the primary owner, while the others were identified on the envelope and in the newspaper. At the time of the mailing of the notice there were seventy actual landowners. To remedy this jurisdictional defect, plaintiffs assert the court must order a reassessment of the lands subject to the costs of construction. *See* Iowa Code § 468.99. In opposition, the defendants contend that the procedure they followed is followed by other county offices, other counties, and is even taught at continuing education seminars. The district court found that the board substantially complied with the notice provisions.

We have held that "[t]he requirements imposed by statute upon an inferior tribunal should not be too technically construed, lest its efficiency and purpose become wholly paralyzed." *Johnson v. Monona–Harrison Drainage Dist.*, 246 Iowa 537, 550, 68 N.W.2d 517, 525 (1955). To this end, we have consistently applied a "substantial compliance" standard when a repair or improvement to an existing drainage district is proposed. *See, e.g., Voogd*, 188 N.W.2d at 390–91; *Thorson v. Board of Supervisors*, 249 Iowa 1088, 1096–97, 90 N.W.2d 730, 733–34 (1958). *See also Stanfield v. Polk County*, 492 N.W.2d 648, 652–53 (Iowa 1992) (substantial compliance standard applied to notice of hearing affecting county taxpayers and residents); *SMB Investments v. Iowa–Illinois Gas & Elec. Co.*, 329 N.W.2d 635, 637 (Iowa 1983) (substantial conformity with the eminent domain notice provision is sufficient). Such a standard is consistent with the legislature's directive to liberally construe the drainage statutes. *See* Iowa Code § 468.2.

■■■ "'Substantial compliance' means compliance to the extent necessary to assure that the reasonable objectives of the statute are met." *Stanfield*, 492 N.W.2d at 652. The notice provisions are intended to safeguard the individual taxpayer and property owners' rights to be informed and to object. *Thompson v. Joint Drainage Dist. No. 3–11*, 259 Iowa 462, 468, 143 N.W.2d 326, 330 (1966). Liberal construction is possible only where there has been sufficient effort towards compliance. *See Voogd*, 188 N.W.2d at 392–93 (board failed to comply with notice provisions after discovery of cost estimate error); *Ioerger*, 203 N.W.2d at 575 (actual notice without any compliance with statute is inadequate).

The plaintiffs do not challenge the contents of the notice itself, but rather claim notice must be mailed to each of the seventy landowners in the district. Land transfers, after recording in the recorder's office, are entered in the county auditor's books. These transfer books list the legal titleholders as well as other parties who have an interest in the property—such as a buyer on contract. In such cases a notice may be sent to the buyer rather than the seller holding the legal title. In other cases notice may be sent to one spouse rather than to both. The auditor testified that a single notice is typically sent to the primary owner unless the books direct otherwise. The same records are used by the offices of the treasurer and assessor for notice of county transactions. In this case all of the other landowners were listed on the notice envelope and included in the published notice. Notably, no plaintiff has asserted that he or she was not informed of the project or was deprived of the opportunity to object because of a lack of individual notice.

We therefore conclude the county substantially complied with the statutory notice provisions.

■ Additionally, the plaintiffs claim that some of the landowners south of the bulkhead did not attend the March or April meetings because they believed they would not be financially affected by the board's decision. However, they did receive notice that the February hearing was continued to March. The assessment issue was discussed at the board's second hearing and the minutes indicated the issue would again be discussed in April. The board did not make its final decision on the project until the April hearing. We find no procedural defect.

### IV. *Repairs and Improvements.*

■ The fighting issue on appeal is whether the 1990 drainage project was a repair or an improvement within the meaning of the statutory provisions. This question is one of fact. *See, e.g., McGuire v. Voight,* 242 Iowa 1106, 1109, 49 N.W.2d 472, 473 (1951). The court concluded the project was repair work, therefore reclassification of benefits was not mandated. For reasons that we discuss, we agree.

There is both a substantive and a procedural difference between a "repair" proceeding and an "improvement" proceeding. Iowa Code section 468.126(1) charges the board of supervisors with keeping a drainage improvement in repair so that it will function properly and perform the services intended. This duty is mandatory. *Johnson,* 246 Iowa at 551–52, 68 N.W.2d at 525. Section 468.-126(1)(a) provides:

> The board at any time on its own motion, without notice, may order done whatever is necessary to restore or maintain a drainage or levee improvement in its original efficiency or capacity, and for that purpose may remove silt and debris, repair any damaged structures, remove weeds and other vegetable growth, and whatever else may be needed to restore or maintain such efficiency or capacity or to prolong its useful life.

If the estimated cost of a repair exceeds certain limits, notice and a hearing is required. *Id.* § 468.126(1)(c). Landowners do not have the right of dismissal by remonstrance with regard to repairs. *Id.* § 468.-126(1)(d).

An improvement to an existing drainage district is defined as "a project intended to expand, enlarge or otherwise increase the capacity of any existing ditch, drain or other facility above that for which it was designed." *Id.* § 468.126(4). If the estimated cost of an improvement exceeds certain limits, notice and a hearing is required and the landowners may file a written remonstrance against the proposed improvement. *Id.* § 468.126(4)(a), (b). The board must also hear objections and determine whether there should be a reclassification of benefits for the costs of construction. *Id.* Because different rights and obligations flow from the character of the work done, plaintiffs contend the board undertook construction under the guise of a repair which is in effect an improvement.

The board selected the first option from the engineer's report. This option stated that the "repair work involves excavation to original grade and shaping the waterway to a 6 [foot] base width and maximum 8:1 side slopes." Johnson noted that this work would provide some relief for the tile capacity deficiencies and would not be affected by remonstrance. The estimated cost of this option was $120,648. The remaining three options were recommendations to repair, replace, and add tile lines to increase the capacity and efficiency of the existing tile. Estimated cost of these options ranged from approximately $99,000 to $687,000.

Under the statutory definition of an improvement plaintiffs urge that our inquiry into the project's purpose is limited to a comparison of the capacity of the waterway before and after the 1990 construction. The plaintiffs argue that the capacity of the surface waterway north of the bulkhead was greatly increased by the 1990 project because it no longer existed or functioned as originally constructed. In any event, they argue the waterway capacity was increased beyond that which existed after the 1917 improvements. Thus, any increase in the capacity of the drainage district conclusively

proves the project was intended as an improvement. *See* Iowa Code § 468.126(4).

To support their theory plaintiffs' experts testified that the slope specifications for the project were roughly two and one-half times flatter than shown on the 1917 plans. The flatter slopes had the effect of tripling the width at the top of the ditch and doubling the capacity of the surface waterway. As a result of the increased capacity, several larger road culverts were installed.

Plaintiffs also attack the board's proceedings from another angle. They presented evidence to support their claim that the waterway had been abandoned by the county by the late 1930s. Several landowners testified that portions of the drainage easement had been filled in and farmed for the past fifty years. LaVerne Oleson testified that while working for Franklin County in 1936 he helped fill in portions of the ditch on one tract of land. He said he worked at the direction of the county engineer and assumed the board was aware of the work. Further, the board met in 1937 and voted to return certain property in the district to the tax rolls "for reason that there is now no open ditch ... and all of said lands having become productive farm lands." The plaintiffs also claim damages because the 1990 improvement took approximately sixty-five additional acres of land out of production.

Defendants argue that the court correctly determined the intent of the project from all of the surrounding facts and circumstances. In response to complaints of poor drainage from landowners at the north end of the district, the board appointed Johnson to investigate the condition of the drainage district. Johnson testified that option one was intended to restore the waterway above the main tile line as closely as possible to its 1917 condition. No records were found, however, which specified the actual side slopes of the waterway. The 1917 plan simply referred to a maximum slope of ten to three. After consulting several reference books he concluded a slope of eight to one would normally be accessible by farm machinery. He designed the repair project to permit such accessibility. Consequently, any increase in capacity was merely incidental.

Additionally, the record shows the 1990 project restored the width and the depth of the ditch to the 1917 specifications. No additional lands are drained by the project. With regard to the alleged expansion of the waterway, Johnson and other experts explained that as a practical matter such repair work often exceeds the original easement because extra dirt from the cleanout forms a spoil bank which is then spread out along the sides of the ditch or waterway to prevent erosion. All of the defendants' experts testified that culverts were strictly a road maintenance matter and did not transform the project into an improvement.

■ The district court examined a variety of factors relied upon by this court in past drainage cases in determining whether the 1990 project was in the nature of a repair. The plaintiffs assert that the court erred in applying the law from those early decisions because the current statutory definitions differ significantly from earlier definitions. We turn now to a review of the older case law.

In the early 1920s a county board of supervisors was required to keep a drainage district in repair and "for that purpose they may cause the same to be enlarged, reopened, deepened, widened, strengthened or lengthened for a better outlet, and they may change or enlarge the same...." Iowa Code § 1989a21 (Supp.1913). We have held that "[t]o repair means to restore to a sound or good condition after decay, injury, dilapidation, or partial destruction." *Walker v. Joint Drainage Dist. No. 2*, 197 Iowa 351, 355, 197 N.W. 72, 73 (1924) (quotation omitted). The court in *Walker* found that relaying of tile near an old line was a repair, while the construction of a new branch line was an improvement. *Id.* at 359, 197 N.W. at 75. To reach its conclusion the court focused on whether the work was done to replace or restore the original line, which was no longer functioning properly, or whether it was a new plan adopted because the original design did not adequately drain the area. *Id.* at 356–59, 197 N.W. at 74–75. The court found that no new lands were drained by the repaired line. *Id.* at 359, 197 N.W. at 75; *see also Kelleher v. Joint Drainage Dist. No. 18*, 216 Iowa 348,

352–54, 249 N.W. 401, 403–04 (1933) (new tile line along different path which was three times larger and served other lands was an improvement).

Similarly, in *Meyerholz v. Board of Supervisors*, 200 Iowa 237, 241–42, 204 N.W. 452, 454–55 (1925), the court looked at whether the location of a levee was changed, whether it was lengthened, and whether any new lands were occupied to determine if a construction project was a repair or an improvement. Although the construction in *Meyerholz* was extensive and costly, the court found the "purpose of the work was to strengthen the levee as built, and restore it so it would adequately perform the function for which it was constructed." *Id.* at 242, 204 N.W. at 454; *see also Board of Supervisors v. Paine*, 203 Iowa 263, 271, 210 N.W. 929, 932–33 (1926) (whether work is a repair "does not depend on the magnitude or cost of the work").

The Iowa legislature amended the Code definitions in 1949. *See* 1949 Iowa Acts ch. 202, § 21. The new provision for a repair proceeding provided that the board

> may order done whatever is necessary to restore or maintain a drainage or levee improvement in its original efficiency or capacity, and for that purpose may remove silt and debris, repair any damaged structures, remove weeds and other vegetable growth, and whatever else may be needed to restore or maintain such efficiency or capacity.

Iowa Code § 455.135 (1949). If improvements "which differ from the repairs" were necessary, they might

> include enlarging, reopening, widening, deepening, straightening or lengthening any drain, changing its location or improving or enlarging the outlet for better service; converting all or any part of any drain from an open ditch to a closed drain; installing surface pipe for open ditches; enlarging, altering, or improving pumping plants; leveling spoil banks, or constructing settling basins.

*Id.* Under the amended definitions the court continued to focus on the same criteria used in its analysis of early drainage disputes. *See, e.g., Jerrel v. Board of Supervisors*, 247

Iowa 339, 344, 73 N.W.2d 766, 769 (1955); *McGuire*, 242 Iowa at 1110–12, 49 N.W.2d at 474. "What is of real importance in determining this question must be found in the conditions as they existed, and the nature and purpose of the work done." *Haugen v. Humboldt–Kossuth Joint Drainage Dist. No. 2*, 231 Iowa 288, 305, 1 N.W.2d 242, 251 (1941).

Again in 1981 the legislature amended the definitions. *See* 1981 Iowa Acts ch. 150, § 1. The repair provision was only changed slightly. A repair may now be constructed to prolong the useful life of a drainage improvement. Iowa Code § 468.126(1)(a). The provision relating to improvements was rewritten. The detailed list of possible improvement options was deleted and an improvement was simply defined as a project which intends to increase the capacity of the existing facility above its original design. *Id.* § 468.126(4).

We reject the plaintiffs' argument that the waterway could not be restored because it no longer existed after the 1930s. While some portions of the waterway were filled in and others simply deteriorated over the years, the aerial photos and the witness testimony convince us that the waterway above the tile line north of the bulkhead remained. We agree that the lands which were returned to the tax rolls in 1937 were lands that had previously been occupied by an open ditch north of the bulkhead. This open ditch was replaced by a tile line and transformed into a surface waterway during the 1917 construction.

Upon our review of past drainage decisions and prior statutory provisions we conclude that the appropriate method of analysis is not the mere application of a mechanical, single factor test. We continue to objectively examine the facts and circumstances of each drainage case. We believe the legislature intended to differentiate between a repair and an improvement on the basis of the nature and purpose of the work done. *Haugen*, 231 Iowa at 305, 1 N.W.2d at 251. A repair may include any action necessary to restore or maintain efficiency or capacity of the drainage district or even to

prolong its useful life. Iowa Code § 468.-126(1)(a). If "it is more economical to construct a new line than to repair the existing line, the new line may be considered to be a repair." *Id.* § 468.126(1)(b). Repair work, therefore, must be in some manner connected to the original improvement and not merely a substitute for the original defective plan or design. *Jerrel,* 247 Iowa at 344–45, 73 N.W.2d at 769; *Kelleher,* 216 Iowa at 352–54, 249 N.W. at 403.

On the other hand, an improvement goes beyond maintenance or restoration. It must be shown that the intent of the project was to change the original plans in order to increase the capacity of the district "above that for which it was designed." Iowa Code § 468.-126(4); *see Jerrel,* 247 Iowa at 344–45, 73 N.W.2d at 769. Although "[i]t is not an easy matter to draw the definite line of demarcation between work that may be properly classified as repair work and work that might be classified as a 'new improvement' ...," we conclude that under this record the 1990 project was properly characterized as repair work. *Meyerholz,* 200 Iowa at 243, 204 N.W. at 455.

The plaintiffs' experts focus solely on the apparent change in the slope of the waterway as proof of the board's intent to increase the district's drainage capacity. They contend the court cannot look beyond the plans themselves to the subjective intent of the board or its engineer. We believe the engineer's report and statements may also be considered as part of our factual analysis. *See McGuire,* 242 Iowa at 1110–11, 49 N.W.2d at 474; *Kelleher,* 216 Iowa at 352–53, 249 N.W. at 403.

The facts and circumstances surrounding this project support a finding that the 1990 project was repair work. Following Johnson's investigation, he informed the board that the existing tile lines were generally inadequate. Option one was the least expensive of the construction proposals and would relieve some of the strain on the "already undersized tile system." It was clearly not intended as a substitute for the 1917 ditch and drainage plan. The construction work appeared extensive because of the poor condition of the surface waterway. Significant-

ly, neither the bottom width of the ditch nor the depth were changed from the 1917 plans. Experts on both sides agreed that spoil banks were unavoidable and a flatter slope would prevent some erosion and might allow for farming on the side slopes. Finally, no additional lands are drained by the project. Accordingly, we hold that the 1990 project constituted a repair and reclassification of benefits was not required.

### V. *Compensation for Drainage Easement.*

 Once a drainage district has been established, the district "is deemed to have acquired by permanent easement all right-of-way for drainage district ditches, tile lines, settling basins and other improvements...." Iowa Code § 468.27. We have held

> that the owner retains the right to use the property in any way not inconsistent with the carrying out of the plans of the drainage district, yet this should not be construed to mean that the owner may, in all cases, enter upon the right of way and level the waste banks so as to reclaim the land for cultivation.

*Johnston v. Drainage Dist. No. 80,* 184 Iowa 346, 350, 168 N.W. 886, 888 (1918); *see also* Iowa Code § 468.149.

Several plaintiffs claim a right to damages not only for the expansion of the drainage easement, but also for the taking of all of the land for the drainage right-of-way. They raise arguments under theories of adverse possession, equitable estoppel, and laches and urge the court to order condemnation proceedings. *See Hammer v. County of Ida,* 231 N.W.2d 896, 902 (Iowa 1975) (mandamus may be used to compel condemnation proceedings).

As discussed earlier, plaintiffs argue that the waterway easement had been filled in and farmed for approximately fifty years. They claim this use of the land establishes an easement by prescription. *See* Iowa Code § 564.1. "A party claiming an easement by prescription must prove, independent of use, that an easement was claimed as a matter of right, and that the other party had express notice thereof." *Mensch v. Netty,* 408

N.W.2d 383, 387 (Iowa 1987). Adverse possession must be established "by evidence distinct from and independent of its use. . . ." Iowa Code § 564.1.

■ According to the plaintiffs, the county lost the permanent drainage easement because they had actual notice of the landowners' claims. To support this argument they point to Oleson's testimony about filling in the ditch on one tract of land at the direction of the county engineer and to the 1937 meeting where the board decided to return certain farmable lands to the tax rolls. We fail to see how this is evidence independent of their use of the land.

In a related argument, plaintiffs claim a right to compensation for the entire easement under the doctrines of equitable estoppel or laches. The crux of their complaint is that the county should be stopped from reclaiming the right-of-way because they took no action to repair or restore the surface waterway for almost fifty years.

■ We have previously applied the doctrine of equitable estoppel to interests in real property. *Henderson v. Millis,* 373 N.W.2d 497, 504–05 (Iowa 1985); *Johnson v. Johnson,* 301 N.W.2d 750, 753–55 (Iowa 1981). To establish estoppel a plaintiff must, by clear and convincing evidence, prove "a false representation or concealment of material facts by the actor, lack of knowledge on the part of the other person, intention by the actor that the representation or concealment be acted on, and reliance by the other person to his prejudice." *Henderson,* 373 N.W.2d at 505. Laches must also be proven by clear and convincing evidence and may apply when an unreasonable delay in asserting rights causes another undue prejudice. *Id.* We agree with the court that the plaintiffs' evidence falls far short of proving the elements of these defenses with respect to the original easement.

Additionally, plaintiffs assert that because the 1990 project expanded the easement beyond its original boundaries they are entitled to compensation for the taking. It is clear the change in the side slopes expanded the right-of-way. The district court concluded the plaintiffs should be compensated for any damages resulting from the expansion of the easement and directed an appraisal of the affected lands. *See* Iowa Code §§ 468.24–.26. We agree. *See* 25 Am.Jur.2d *Easements & Licenses* § 76, at 482; § 87, at 493 (1966).

VI. *Equitable Reclassification.*

■ Plaintiffs' final assignment of error is that the board should have ordered a reclassification of benefits for equitable reasons. *See* Iowa Code §§ 468.65, 468.67. Many of the landowners south of the bulkhead, along the open ditch, contend they should not be subject to assessment for the 1990 project costs because they received no benefits from the construction and have even suffered damages as a result of the project. Other landowners to the north raise similar claims.

Iowa Code section 468.65 provides that when a repair or improvement is necessary "the board may consider whether the existing assessments are equitable as a basis for payment of the expense of maintaining the district and of making the repair, improvement or extension." If the board finds the assessments inequitable, it must order a reclassification as set forth in the Code. *Id.* Under this statute the board has the discretion to reconsider the existing classifications.

■ Mandamus is generally limited to occasions where an official or entity has a duty to act. *Charles Gabus Ford, Inc. v. Iowa State Highway Comm'n,* 224 N.W.2d 639, 644 (Iowa 1974); Iowa Code § 661.1. Where the duty is discretionary, however, "mandamus will lie only if it is shown defendant acted arbitrarily or capriciously in denying the request. . . ." *Charles Gabus Ford,* 224 N.W.2d at 644.

Under the Code, reclassification must be considered at a public hearing whenever a project is deemed an improvement. Iowa Code § 468.126(4)(a). But if a project is a repair it is within the board's discretion to consider the existing classification scheme. *Id.* § 468.65. Here the drainage district was reclassified in 1983. At that time the mains and laterals were classified separately for assessment purposes. This process fixes a

percentage of actual benefits of certain areas within the drainage district and apportions the costs of work among those served in an equitable manner. *See* Iowa Code § 468.67. In light of the evidence in the record we conclude the board's decision not to undertake reclassification of the district following the repair work was not arbitrary or capricious.

We have considered all issues presented and find no error in the district court's ruling.

**AFFIRMED.**